CONSOLIDATED BEEF & PROVISION CO. *v.* WITT
& CO., INC.

[No. 45, October Term, 1944.]

*Decided December 20, 1944.*

106

The cause was submitted to MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, MELVIN, BAILEY, CAPPER and HENDERSON, JJ.

*Harry O. Levin* on the brief for the appellant.

*Max R. Israelson* on the brief for the appellee.

COLLINS, J., delivered the opinion of the Court.

Witt & Company, Inc., plaintiff, appellee, entered suit in the Superior Court of Baltimore City against The Consolidated Beef & Provision Company, a body corporate, defendant, appellant, for payment for 1762 pounds of beef tongues at twenty-four cents per pound, the amount alleged to be due being $422.88. After general issue plea was filed by the defendant, the case was heard by the trial Judge and a judgment rendered for Witt & Company, Inc., for the amount claimed, $422.88.

From that judgment the Consolidated Beef & Provision Company appeals to this Court.

The appeal is taken from the judgment on exceptions to proffered evidence which the trial Judge refused to admit, and by virtue of General Rules of Practice and Procedure, III, Trials, Rule 9 (c), effective September 1, 1941, allowing this Court to review the case on the evidence. As the weight of the evidence is before this Court, it is necessary to recite it in some detail.

Barry T. Wright, manager of plaintiff corporation at the time of the transaction on September 15, 1943, called as a witness for plaintiff, testified to the facts contained in this paragraph. Mr. Maurice Salganik, agent of defendant corporation, came on Wednesday, September 15, 1943, to plaintiff's place of business to buy anything they had to offer. He told Mr. Salganik that they had four or five barrels and boxes of fresh beef tongues of

which one box and one barrel were a little off condition, not as fresh as they could have been. The prevailing price was twenty-seven cents a pound, but on account of the off condition of the barrel and box of tongues, he offered the whole lot to him for twenty-four cents a pound. He was not sure whether the box and barrel were marked "beef tongues" or "ox lips." In the presence of Mr. Samuel Kolker, the president of plaintiff corporation, who was there during the whole transaction, all of the barrels and boxes were opened and examined by Salganik. He pointed out to him the box and barrel which were in off condition. Some of the tongues were chilled, not frozen, and their condition did not prevent a proper examination by Salganik and the ascertainment in his presence and in the presence of Mr. Kolker as to whether or not they were acceptable. After examining them, Salganik signed the ticket and had plaintiff's men load the barrels and boxes on his truck and he hauled them away himself. Witness testified that the off condition tongues were fit for human consumption. The witness then produced the invoice and ticket signed by Mr. Salganik showing a sale of 1,762 pounds at twenty-four cents, a total of $422.88. On the following Thursday or Friday he had a telephone call from Mr. Salganik who said he would pay ten cents a pound for the lot of tongues because the barrel and box were in "off condtion" and all he could get was ten cents, and the tongues were worse than he thought they were. Witness told him that this was ridiculous, that he must be crazy or something like that. He next heard from Salganik on the following Saturday when he came to plaintiff's place of business and asked if witness would allow him a credit of fourteen cents a pound for the tongues. Witness refused to do this as did also Mr. Kolker. On the following Monday, September 20, Salganik returned the tongues which the plaintiff would not accept. He further testified that he left the employ of the plaintiff on the 25th of September, 1943, and went into business for himself on December 1st. He said he was certain that after that

time he did not sell anything to the Consolidated Beef Company. His business is a partnership known as the Wright Beef Company. He does not make all the sales. His partner, Mr. Segal, might have sold something to the Consolidated Beef Company and he would not know it. The witness then identified an invoice dated January 8, 1944, showing a sale made by Mr. Segal of the Wright Beef Company to the Consolidated Beef Company for $350.61, and the defendant offered this invoice in evidence. The Court refused to admit this invoice, and to this refusal the defendant noted an exception.

Samuel Kolker, the president of plaintiff corporation, testified that on September 15th, the morning of the transaction, Mr. Salganik stopped at a place of business across the street from that of the plaintiff corporation where he was at the time. He knew that he was buying tongues, so he told him that he had a few barrels across the street and would like him to look at them. They walked across the street to plaintiff's place of business where, in the presence of Mr. Wright, they discussed the price of the tongues. There were six barrels and a box of which one barrel and a box were a little off condition, and Wright had a conversation with Mr. Salganik regarding that. On that day the price for first-class tongues of that quality was twenty-seven cents. As a result of their conversation, Salganik finally bought the whole lot of tongues for twenty-four cents a pound. Witnesses saw him make an examination of the tongues. One of the employees opened up the tops and Mr. Salganik looked at and examined every barrel, and he opened up a box and looked at that and agreed to take them. There was nothing about their condition which prevented him from making a thorough examination or from seeing or ascertaining the condition of the tongues. After the examination and after they were weighed, they started making out the invoice. The witness said, in other words, that the barrels were rolled out on the pavement, opened up for Salganik to look at them thoroughly, more in the light. Each and every barrel was rolled on the pave-

ment and they were opened outside so Mr. Salganik could examine them thoroughly. One of plaintiff's men and defendant's driver loaded the goods on a truck of the Consolidated Beef Company and Salganik signed the invoice in evidence. On the following Saturday he came to plaintiff's place of business, complained about the tongues, that they were not good enough. He said he told him: "You saw them, you bought them, you examined them. As far as I am concerned, it was a perfect sale. I am not responsible for what you have done with them after you took them from my place." Salganik offered ten cents a pound which witness refused, stating that he would not make any reduction in price.

Maurice Salganik, purchasing agent for the defendant, testified for the defendant that since September 15, 1943, he had seen Mr. Wright once every day or every other day. In January, 1944, he was at the Wright Beef Company. To the question as to whether Mr. Salganik did or did not on January 8, 1944, purchase from Mr. Segal in the presence of Mr. Wright a lot of merchandise, the plaintiff objected. The Court sustained the objection, and the defendant noted an exception. The defendant again attempted to offer in evidence the invoice in the amount of $350.61 formerly rejected. The plaintiff objected. The Court sustained the objection and allowed defendant an exception.

Mr. Salganik further testified that Mr. Kolker was not present when the purchase of the tongues was made by him or at any time during the transaction. He said Kolker was across the street and he was told by Kolker there that they had some tongues across the street. He said that Mr. Wright had the tongues in a big cooler. He had a few barrels of tongues, he did not see exactly how many, and Mr. Wright offered them for sale at twenty-four cents. He said he had been buying fresh frozen tongues at that place regularly for twenty-four cents and had been paying the same elsewhere. Fresh frozen tongues are packed and are immediately put in a freezer. They are put in dry. They cannot be fresh

frozen unless they are dry. He said that Mr. Wright had one of the barrels open and he looked at the barrel and asked, "Are all these barrels like the sample?" To which question Wright answered, "Yes." He said he told Wright that if they were fresh tongues like the one shown him, he would take all he had. He said he looked at one barrel and only one barrel was opened. The tongues in that barrel were frozen. He said that Wright told him that all of the tongues were like the sample. He walked away after telling Wright to get the tongues out and went around the corner. There was no mention about any off condition tongues at any time. He said that after the ticket was made out and signed and the tongues were on the truck, Wright then asked him if he could use any "shady" tongues in off condition. The witness said he then replied: "I wouldn't have them for any price." In the meantime one of the men said, "They have gone already." He arrived at the plant of the defendant within two hours and looked inside the truck. The floor was wet and he became suspicious and opened all the barrels and found four barrels like the sample, in good condition. Two of the barrels looked absolutely soft and the outside container was marked "ox lips." The one box was also opened and found to be in off condition, being soft and spoiled.

Maurice Salganik, the witness, further said that he called Mr. Wright on the telephone the next morning and told him that two barrels and one box were not as represented and he wouldn't have them for ten cents a pound. He went over to see Mr. Wright but did not find him. He called him on Friday and Wright told him to come over, but he could not locate him when he arrived. He said he went over on Saturday and told Wright that he could use only the good tongues and that he could have them all back or he would use the good ones and bring the others back. Wright said to take all or none. He then saw Mr. Kolker and was told by him that if he could not use the tongues to bring them back. He said he brought them back on Monday morning, dumped them

on the sidewalk and Wright would not look at them. Kolker told him if he went in the place, he would throw him out. He then had the helper put the tongues in a storage warehouse and told Wright that he had put them there for plaintiff's account. He said that when he came back on Saturday morning, he never discussed the price but said that he wouldn't use them at any price and he thought he was buying first-class goods. He further testified that he gave the information to Isidore Salganik who wrote a letter as president of defendant corporation to plaintiff corporation, and he thinks he read the letter before it went out. He said the letter contained a true statement of the way the transaction was handled. The letter was offered in evidence and contained substantially the statements made by Maurice Salganik in his testimony. The letter, however, stated that the box and one barrel were found to be bad and the other tongues in off conditions. The letter stated that the six barrels and one box were at the storage company for plaintiff's account and risk and asked that plaintiff reimburse them in the amount of $17.62 for their local delivery charges. When asked to explain why the letter stated that one box and one barrel were shady tongues and the other tongues were in off condition, while in his testimony he said that one box and two barrels were in off condition and the other four barrels were in good condition, he said that by other tongues he meant the off condition tongues.

The exceptions refer to the unsuccessful effort of the defendant to offer evidence that on January 8, 1944, after Barry T. Wright had left plaintiff's employ and formed the Wright Beef Company, the Wright Beef Company sold meat to the Consolidated Beef Company. Defendant contends that the purpose of this offer was to attack the credibility of Wright who had previously testified that he did not sell anything to the Consolidated Beef Company, that his partner could have. If this evidence had been admitted, we do not see how it could have affected the credibility of Wright. The invoice the

defendant attempted to offer was a sale by Mr. Segal, not by Wright. Further in the testimony, an effort was made to show that Mr. Wright was present when the purchase was made from Segal, which testimony was refused. This, however, still did not contradict Wright's testimony that he did not make the sale. It is difficult to see what possible relation there is in the transaction between plaintiff and defendant on September 15, 1943, and a sale made by the Wright Beef Company to defendant on January 8, 1944. Defendant contends that such testimony would show bias, hostility or interest. Just why sales to defendant corporation by Wright after he left the employ of the plaintiff would show bias, hostility or interest cannot be seen. If Wright had been doing business with defendant corporation, it would be natural for him to be friendly to his customer, the defendant, and not otherwise. This proffered testimony was clearly collateral and irrelevant. Although on cross-examination Wright testified that he did not sell anything to the Consolidated Beef Company and no objection was made and it went in the record, it is still collateral and irrelevant. Even though the cross-examination of Wright was made upon a matter wholly collateral and irrelevant to the issue and went in without objection, evidence to contradict that testimony was properly refused. It was an attempt to impeach the witness in a collateral and immaterial matter. It is a general rule that a witness cannot be cross-examined about a matter which, if admitted, would be wholly collateral and irrelevant to the question and issue, for the purpose of contradicting him by other evidence and thereby to discredit his testimony. If the witness answers such an irrelevant question without objection, evidence should not afterwards be admitted to contradict his testimony on the collateral matter. *Poe, Pleading and Practice,* 5th Ed., Vol. 2, Sec. 277; *Sloan v. Edwards,* 61 Md. 89, 105; *Baltimore City Passenger Ry. Co. v. Tanner,* 90 Md. 315, 320, 45 A. 188; *Quimby v. Greenhawk,* 166 Md. 335, 171 A. 59.

The trial court was therefore correct in refusing the proffered evidence, the subject of the exceptions.

Under Rule 9 (c), supra, this Court reviews both the law and the evidence. The rule specifically provides the judgment of the trial court shall not be set aside on the evidence unless clearly erroneous and due regard shall be given to the opportunity of the trial court to judge of the credibility of witnesses. *Lucas v. Maryland Drydock Company,* 182 Md. 54, 31 A. 2d 267. In this case the plaintiff by its president offered evidence that the goods were sold subject to inspection, were inspected, price agreed upon and the goods delivered. This testimony is corroborated in every detail by Barry T. Wright, a former manager for plaintiff corporation, but at the time of the trial not employed by plaintiff but operating his own company and as far as the record shows, a disinterested witness. Against this evidence the defendant offered one witness, Maurice Salganik, who admitted the purchase and delivery but denies a previous inspection of five of the barrels and one box containing the tongues. The weight of his testimony is questionable when we find that in a letter written under his direction after delivery of goods, it was stated that all of the tongues were in off condition while in his testimony at the trial he said that one box and two barrels were in off condition and the other four barrels were in good condition. This Court therefore concludes that the judgment rendered by the trial court should be affirmed.

*Judgment affirmed, with costs.*