703 A.2d 208

**Ruthann ARON**

v.

**William E. BROCK III.**

**No. 1545, Sept. Term, 1996.**

Court of Special Appeals of Maryland.

May 29, 1997.

Reconsideration Denied Aug. 26, 1997.

478

Albert D. Brault (Brault, Graham, Scott & Brault, Rockville, Robert L. Beerman and Beerman & Walder, New York City, on the brief), for Appellant.

Benjamin Cotten (Cotten & Selfon, Washington, DC and T. Joseph, Glen Burnie, on the brief), for Appellee.

Argued before MURPHY, C.J., and CATHELL and HOLLANDER, JJ.

CATHELL, Judge.

Ruthann Aron appeals from a jury verdict rendered in the Circuit Court for Anne Arundel County and from a subsequent order by the trial court that denied her Motion for a New Trial and imposed sanctions against her for filing that motion. She presents several questions on appeal:

I. Did the circuit court err in admitting into evidence extrinsic testimony on collateral matters which [was] highly prejudicial to Aron's case?

A. Was this testimony relevant to the substantive issues at trial?

B. Was this testimony highly prejudicial?

II. Did the circuit court err in refusing to find juror misconduct based upon the preparation of a trial notebook outside of the courthouse?

A. Did the circuit court err in denying Aron's motion for a new trial?

B. Did the circuit court err in its refusal to permit Aron to review extrinsic material created by a juror at home and brought into jury deliberations to determine the existence of juror misconduct?

III. Did the circuit court err in sanctioning Aron as a result of Aron's post[-]trial motion?

A. Did the circuit court fail to make required findings as to bad faith or lack of substantial justification for the filing of the motion for a new trial by Aron?

B. Did the circuit court err by stating that imposition of sanctions under Maryland Rule 1–341 is mandatory?

C. Were the amounts awarded by the circuit court in excess of the costs actually incurred by defendant in defending the motion for a new trial based on juror misconduct?

## The Facts

Appellant filed suit below against William E. Brock III, appellee. Her Complaint described the suit as follows:

### NATURE OF THE ACTION

1. Plaintiff files this action to hold Defendant Brock accountable for the malicious defamation, intentional infliction of emotional distress and outrageous conduct which he resorted to in his attempt to salvage his stumbling campaign against Plaintiff for the 1994 Maryland Republican Party nomination for the United States Senate. While the nature of a political campaign necessitates some latitude in the tactics which can legitimately be used to portray a competing candidate, Brock crossed all bounds of decency and licensed conduct when he maliciously defamed Plaintiff during the final days of the campaign by falsely telling newspaper reporters and prospective voters that Plaintiff had been "convicted" of, or had otherwise been found guilty of, committing a criminal offense. This was a lie whose genesis was Defendant's desperate attempt to discredit Plaintiff who, according to polls, was in a dead heat with Defendant for the Republican nomination. Moreover, Defendant knew it was a lie or acted with reckless disregard for the truth. Political campaign or not, Brock must be made accountable

for all damages proximately resulting from Brock's malicious defamation of Plaintiff.

2. Brock's unjustified and indefensible assassination of his opponent's character caused Plaintiff to suffer extreme mental anguish, humiliation, embarrassment, and potentially permanent damage to her reputation. Moreover, by unleashing his smear campaign against Aron immediately prior to the primary election, Brock stripped Plaintiff of any meaningful chance to set the record straight in time to obtain her party's nomination. As a result, Brock selfishly denied the Republican Party voters of Maryland the opportunity to make a clearly informed choice as to their candidate to run against the incumbent U.S. Senator for Maryland—Democrat Paul Sarbanes.

After an extensive factual recitation, appellant's complaint asserted four counts. In count one, "Defamation/Slander Per Se—September 7, 1994," appellant asserted that appellee "at the Rockville Courthouse ... in the presence and hearing of one or more newspaper reporters, stated that Aron *had been convicted* of fraud by a jury more than once." (Emphasis added.) She asserted that the statement was knowingly false, slanderous per se, malicious, not justified or privileged and that appellee made the statement with the intent that it be disseminated by one or more newspapers to potential voters who lived in the area and would be voting in the upcoming election. Appellant further asserted that appellee made the statement to discredit her candidacy for the 1994 Republican Party nomination for the United States Senate. As a result of the defamation, appellant alleged that she had been ridiculed, her credit had been impaired, her business relationships had been negatively affected, her reputation for honesty had been demeaned, and her standing as a citizen had been "impugned and belittled." As a result, appellant alleged damage to her personal, political, business, and professional reputation. She also asserted that she had lost "the opportunity to serve in the United States Senate."

In count two, "Defamation/Libel Per Se—September 8, 1994," appellant alleged that the statement made by appellee

on September 7, 1994, described in the first count, had been "republished by *The Washington Post* ... on September 8, 1994." She made further averments similar to those made in count one.

In count three, "Defamation/Slander and Libel Per Se—September 9–12, 1994," appellant alleged that appellee was responsible for certain television commercials that ran during the applicable period. Appellant asserted that the commercials stated that she had " 'trouble obeying the law'; had been 'more than once' 'ruled ... out of bounds' by a court of law; and had 'admitted to ... wrongdoing.' " She asserted that the commercials were intended to convey that she had been found guilty of criminal conduct, and that they were false, maliciously made, and approved by appellee. She included other averments as to damages and other matters similar to those contained in counts one and two.

The fourth count was also a defamation/slander count that was similar to count three except that the defamatory statements were made in radio commercials. In the fifth count, "Intentional Infliction of Emotional Distress," appellant asserted that appellee's conduct "was so extreme and outrageous that it exceeded the boundaries of decency and is utterly intolerable to the civilized community."

The jury returned a verdict on March 12, 1996. The verdict sheet reflected that the jury found that the statement(s) were published but that they were neither false nor defamatory.

On March 19, 1996, seven days after the rendition of the jury's verdict and three days prior to appellant's timely filing of a Motion for New Trial, the docket entries reflect the following: "Order of Court that the motion for confiscation is hereby granted." That order resulted from appellant's filing of an emergency motion requesting that the court confiscate a juror's notebook. That motion alleged that a juror had prepared at his home in the evenings a personal notebook and brought it into the jury deliberations and that the notebook "was represented [to the other jurors] to constitute the true record of the evidence in this case." That notebook was

represented to be "tabbed" and to contain "highlighting" of certain portions. It was represented to the court as having contained that juror's summary and commentary on the evidence and exhibits presented. Appellant alleged that the respective juror used the notebook to dominate the deliberations and "control the discussions." Appellant's motion noted that what the juror had done in preparing the notebook at home violated at least the spirit of Maryland Rule 2–521. She argued in the motion for confiscation that what the juror had done was improper, citing Niemeyer & Shuett, *Maryland Rules Commentary* 396 (2d ed. 1992): "The [jurors'] notes can be picked up each day as the jury returns to the jury room. The practice avoids extraneous influences and 'homework' by jurors." Appellant argued below that the practice the juror had conducted in formulating his notes at home and in formulating his comments and position during the course of the trial, violated the requirement that the notes remain in the jury room or with the bailiff, in order to avoid "extraneous influences" and "homework."[1] She also asserts that the juror's conduct had been contrary to the trial court's instructions "not to begin to deliberate until the close of the case." The trial court granted the motion and confiscated the notebook.

Appellant subsequently filed a Motion for New Trial. She asserted in that motion that the trial court improperly admitted provocation evidence and that appellee made prejudicial comments at closing argument. She also relied, in part, on the juror's inappropriate, out-of-court compilation of the notebook, and the subsequent in-court use of that notebook to influence other jurors. Appellant requested a hearing on the issue and "permission to review [the juror's] notes [the notebook compiled outside the courtroom] in order to ... know how serious and prejudicial was the breach." Appellant proffered that, in reviewing the notebook, she would not be

---

1. We have been unable to find where the trial court gave such a preliminary instruction to the jurors. The parties have not directed us to extract references for such an instruction.

delving into that individual juror's "subjective deliberative process." Rather, she sought to examine the extrinsic material, *i.e.*, the notebook the juror had brought into the jury room.

The docket entries reflect that on March 26, 1996, the Motion for New Trial was denied "except as to juror misconduct." The trial court, after a hearing, denied the motion "as to juror's misconduct" and imposed Rule 1–341 sanctions against appellant for presenting the issue. We shall present additional facts as are necessary to the resolution of appellant's questions.

## I.

**Did the circuit court err in admitting into evidence extrinsic testimony on collateral matters which [was] highly prejudicial to Aron's case?**

As we have indicated, this case involves allegations by appellant that appellee made defamatory and slanderous comments about her during the 1994 primary election for the Republican nomination for United States senator. Specifically, appellant asserted that on September 7, 1994, at a press conference in front of the old Montgomery County Courthouse in Rockville, appellee stated to one or more newspaper reporters that appellant had been convicted of fraud by a jury on more than one occasion.

On the following day, *The Washington Post* quoted appellee as stating that appellant "ha[d] been convicted by jury of fraud, more than once." Sometime later, appellee or members of his campaign caused the following television commercial to be broadcast:

Ruthann Aron? The Baltimore Sun reported while she was making millions as a real estate speculator, she had trouble obeying the law. More than once the court ruled her out of bounds. She admitted to the Sun she paid more than $300,000 because of her wrongdoing.

The television commercial also noted graphically: "A Montgomery County jury found [Aron] liable for *breach of contract* and fraud and awarded the plaintiff $300,000."

In addition to the television commercial, appellant alleges that the following radio commercial was defamatory:

[A]ccording to the Baltimore Sun, Ruth Ann [sic] Aron has trouble obeying the law while she's making money. More than once the court had to rule Ruth Ann [sic] Aron out of bounds. Ruth Ann [sic] Aron admitted to the Baltimore Sun she paid more than $300,000 because of her wrongdoing.

These statements and assertions made by appellee during the primary election were based on two earlier civil lawsuits that involved appellant. In the first suit, appellant was sued for breach of contract, breach of fiduciary duty, and constructive fraud. This suit involved an alleged agreement between appellant and others in respect to a real estate project. Appellant testified extensively in the case *sub judice* regarding the underlying facts and outcome of that prior lawsuit:

[APPELLANT'S TRIAL COUNSEL:][2] Let me ask you this; what did they sue you for?

[MS. ARON:] Everything. Breach of contract, breach of fiduciary duty, fraud, constructive fraud; that's all I remember.

. . . .

Q   And did the jury find against you?

A Yes.

. . . .

Q   What happened after the case?

A Well, I was pretty upset. . . . [W]e filed an appeal. . . .

. . . [W]e filed an appeal and then . . . one of them contacted my husband. He knew my husband and he said they wanted to settle the case and I was not about to settle the case with that kind of finding on my reputation. And their counsel, my counsel, got together and, eventually, the judge vacated the jury finding and we settled the case.

. . . .

---

2.   Appellant is represented on appeal by new counsel.

Q   And what was your understanding of the significance of the Court vacating the judgement against you?

A   *My understanding is,* that if a judgement is vacated, it's like it didn't happen because if it's vacated and a new trial is set down, you don't have a new trial based on what happened before, you have a new trial based on a clear blackboard.   You have [a] new trial based on there not being any finding, whatsoever.   I never, ever, ever would have participated in a procedure that I was advised to participate in by counsel, being told that the jury finding being vacated meant that it was, I guess, what's called in the law, "null and void," a nullity, like it never happened. [Emphasis added.]

The second suit involved a real estate joint venture in which appellant was a partner.   Appellant also testified extensively regarding that civil case, referred to by her as the "Clinton property" litigation:

[MS. ARON:]   ...   [T]his financing person who was in jail at this time, he sued me and my partner for the profits that we made when we sold the property.

[APPELLANT'S TRIAL COUNSEL:]   What happened in that law suit?

A   Well, the jury found against my partner and I and we were stunned and our attorneys filed what's called a "Judgement Notwithstanding the Verdict," laying out all the evidence and laying what the facts were, what our agreement was, everything, and a very highly respected judge in the federal court set aside the jury's finding. . . .   He even went through the whole set of issues and said that he reviewed the evidence and found that the evidence showed this person breached the contract, the financing person breached the contract, not us, and he found for us and said, I mean just said, basically, the verdict was "null and void."

. . . .

Q   Now, what happened after the judge vacated the judgement?

A ... [T]here [were] some ... [m]otions on the side of the lawyers for the financing partner. They were claiming there was confusion as to the breach of contract decision, and the judge ... ordered a new trial on that count of the case.

. . . .

A Well, rather than go through a new trial, ... I decided based on business judgement to settle the case....

. . . .

Q Was there any claim for fraud in the second case?

A None whatsoever[.]

Q Was there any finding of fraud in this case?

A There was no claim, there was no finding.

Q *Was there a claim for conversion, do you recall?*

A Yes. [Emphasis added.]

During the presentation of his case, appellee introduced the testimony of Arthur Kahn and John Harrison. Messrs. Kahn and Harrison were the attorneys who had represented appellant's adversaries in the two prior civil actions.

Mr. Harrison, the attorney who represented appellant's adversary in the second civil suit (the Clinton transaction), testified that he filed four causes of action against appellant and the partnership in which she was involved: 1) breach of contract, 2) breach of fiduciary duty, 3) accounting, and 4) conversion. Although he was not permitted to testify as to the facts of that case, Mr. Harrison was permitted to testify regarding the result and ultimate disposition of the case. He indicated that the jury returned a verdict in favor of his client[3] on the breach of contract, breach of fiduciary duty, and the conversion counts. Mr. Harrison then testified that the trial judge granted appellant's motion for judgment notwithstanding the verdict as to the conversion count because it was

---

3. Mr. Harrison was actually representing the bankruptcy trustee in connection with the bankruptcy of one of the entities that was a joint venturer with appellant. The trustee was suing the partnerships and joint ventures in which the bankrupt corporation was involved.

premature. Mr. Harrison then testified regarding what was left to be done in connection with that case:

[APPELLEE'S COUNSEL:] With respect to what remained to be done in trial, explain that to the jury?

. . . .

[MR. HARRISON:] Thank you your Honor. What remained to be done at trial was a new trial was scheduled for March 8th of the following year. . . . [A]t that time we would have gone forward with another jury on the two issues of breach of contract and breach of fiduciary duty. And we would have gone forward on the accounting. . . .

. . . .

Q Would the issue of fraud have been an issue in the case?

A The issue of fraud was definitely an issue. The Court finds on an accounting suit that it's . . . almost an automatic finding of fraud or constructive fraud. . . .

[APPELLANT'S COUNSEL]: May we approach the bench Your Honor?

COURT: Yes.

### Bench Conference

[APPELLANT'S COUNSEL]: Your Honor he's done it once again. He comes in the back door. . . .

. . . .

COURT: . . . The nature, the answer to the question as to fraud and so forth goes back to the allegations that were made. I'll allow it to stand.

### End Bench Conference.

Q I'm asking why would the fraud have been an open issue in the remaining trial to be decided by the jury?

A Under breach of fiduciary duty in the accounting count, all of these counts were tried under Maryland Law and not Virginia Law. Under the breach of fiduciary duty in

the accounting count when you show the fiduciary has received money on behalf—

[APPELLANT'S COUNSEL]: Object.

COURT: All right wait let's just leave it without all the details that it was an element of the claim.

The trial court also permitted Mr. Harrison to testify regarding the eventual settlement in the action. The court carefully excluded evidence regarding the underlying facts of the previous civil case.

Mr. Kahn, who represented appellant's adversaries in the other civil suit, testified regarding that case. Appellee tried to introduce Mr. Kahn's testimony as to the facts of the suit, and appellant's counsel objected. The following ensued:

[APPELLANT'S COUNSEL]: Your Honor we're just simply re[-]litigating the case.

COURT: Why are you going into this?

[ONE OF APPELLEE'S TRIAL ATTORNEYS]: Your Honor, you will recall that the plaintiff on direct examination took the stand and discussed in detail the subject matter of the suit, why she was sued, what she did, what she didn't do, and all the transactions that she says gave rise to this suit and this misunderstanding. She described how . . . she didn't pay them because of misunderstandings with regard to financing and they didn't do this and they didn't do that, and she . . . described . . . in some detail the nature of the transaction that gave rise to the suit. I'm doing nothing more then [sic] essentially describing the same background and giving if you will the reverse side of that story. . . .

. . . .

COURT: I'm not going to allow that to go into the substance of the suit.

Appellee's counsel again tried to introduce Mr. Kahn's testimony regarding the substance of the previous civil suit, and appellant again objected. The following then transpired:

[ANOTHER OF APPELLEE'S ATTORNEYS]: Excuse me your Honor. Excuse me. Could we ask ... the benefit of one thing so we [are] clear for basis for your ruling cause we're arguing they opened the door for this and was permitted to testify even so far your Honor as saying and in response to the questions well why did the jury rule against you? ...

COURT: I think all this [is] collateral. I have no problem as to the results of the suit and the jury verdict and all the rest of it, but how we arrived at that verdict I'm just not going to allow any testimony.

Mr. Kahn then testified:

Q And with regard to the outcome of that case what did the jury do?

A The jury as I recall returned a verdict against ... Mrs. Aron and her company in the amount of as I recall a hundred and fifty-five thousand dollars in compensatory damages and ... ninety-two thousand dollars in punitive damages.

. . . .

Q After the return of that verdict by the jury could you describe what happened in terms of post[-]verdict activity by Miss Aron to her counsel and by the Court?

A ... Mrs. Aron filed a motion for what's called Judgement Notwithstanding the Verdict.... [T]he ... judge who tried the case denied that motion....

. . . .

A He [the judge] ... denied Mrs. Aron's motion on the condition that the plaintiff agree to accept instead of ninety-two thousand dollars in punitive damages from her twenty thousand dollars keeping in tact [sic] the one hundred and fifty-five thousand dollars compensatory damage award.

. . . .

Q All right. What were your options at that point as attorney representing the plaintiff?

A   Well if we did not accept the judge[']s remittitur of that amount then a new trial would have been ordered.

Q   Okay.

A   So therefore we elected to indeed accept the remittitur and a judgement there upon [sic] was entered against Mrs. Aron in the amount of a hundred and fifty-five thousand dollars in compensatory damages and twenty thousand dollars in punitive damages.

Q   With respect at that point what happened with regard to further inner action [sic] between you and Mrs. Aron or her counsel?

A   Mrs. Aron there upon [sic] filed an appeal to the . . . Maryland Court of Special Appeals. . . .

   . . . .

A   Mrs. Aron had agreed to pay the amount of the damages awarded by the jury including the reduced amount of the punitive damage claim on the condition that we the plaintiff file a motion withdrawing this remittitur of the punitive damage award.

   . . . .

A   . . . [T]he effect of us filing a motion to withdraw the remittitur then put the case in the posture of being set for a new trial since the Judge had in denying her motion for a new trial conditioned his order upon us accepting the remittitur.   So when we filed the motion for the remittitur the Judge there upon [sic] based on his previous order . . . ordered that a new trial occur.

   . . . .

Q   Was there ever a new trial?

A   No.

Q   Why not?

A   Well our agreement with Mrs. Aron was that we wanted to be paid the amount of the judgement that had been entered against her and our clients rather then [sic] having to go through an appeal process wanted their money

now rather then [sic] later.... To facilitate us getting paid the damage award we went along with it....

....

Q   Mr. Kahn, Mrs. Aron has described this suit as having been business disputes that were settled out of court. Would you concur with that description?

A   Well we got a judgement against Mrs. Aron and as a consequence of that judgement she agreed to pay us what she owed us.

Q   Do you regard that as being settled out of court?

A   Well it depends [on] what you mean by settled out of court.   Certainly the substance and the jest [sic] of the transaction was that we had a damage award....

....

A   We had a damage award returned by ... a jury ... in the amount of ... as I said a hundred and fifty-five thousand plus ninety-two thousand that was reduced to twenty on the punitive end and Mrs. Aron agreed to pay these damages and in order to facilitate her payment of these damages we agreed to at her request file this motion to withdraw the remittitur which for posterity sake would have set the case for a new trial and vacated the verdict. But as far as we were concerned we didn't settle the case. We tried the case for two weeks.  She made us try the case and only after we got our judgement did she finally agree to pay us.

Q   ... [T]here's been a suggestion that somehow or another the jury verdict in this case ... was a nullity....

....

A   Mrs. Aron filed a motion to set aside the verdict and the Judge denied the motion.  The verdict was supported by the weight of the evidence.  There was nothing defective in the verdict as far as we could see.  Judge's denial of a motion to set aside the verdict ... substantiates that.

Q   And with regard to how the verdict eventually was stricken it was only cause she paid the judgement and you agreed to this arrangement to allow the dismissal?

A   Correct.

Appellant contends that Messrs. Kahn and Harrison testified regarding collateral matters and, therefore, their testimony was inadmissible. She further argues that "[s]ince Messrs. Kahn and Harrison were called as witnesses for no other purpose but to contradict Aron's testimony, it was error to admit this evidence. Moreover ... the testimony was highly prejudicial and substantially injurious to [appellant's] case."

Appellant also asserts that

because these witnesses were attorneys, they were given the latitude and allowed to testify as to the effect of the judgments in the prior civil actions, and whether or not these judgments were nullified by reason of the events following trial. The witnesses speculated as to the legal conclusions which are outside the realm of proper opinion and which, as presented by these witnesses, were contrary to the law, and just plain wrong.

As far back as 1834, the Maryland Court of Appeals recognized that a witness may not be impeached by extrinsic evidence that contradicts the witness's testimony in respect to facts that are collateral or irrelevant to the issues in the case. *See Goodhand v. Benton,* 6 G. & J. 481, 487–88 (Md.1834); *see also Consolidated Beef & Provision Co. v. Witt & Co.,* 184 Md. 105, 112, 40 A.2d 295 (1944).

This common-law rule of evidence is now codified in Maryland Rule 5–616(b)(2). This rule provides: "Other extrinsic evidence contradicting a witness's testimony ordinarily may be admitted only on non-collateral matters. In the court's discretion, however, extrinsic evidence may be admitted on collateral matters." Rule 5–616(b)(2) makes clear that the absolute common-law prohibition on the introduction of collateral, extrinsic evidence for impeachment purposes has been modified so that such evidence may be admitted in the court's discretion. Thus, the questions are: was the testimony collateral in the first instance; and, if so, did the trial court abuse its discretion in admitting the testimony?

An article in the *Maryland Law Review* written by Professor Alan D. Hornstein[4] concerns, in part, the issue we here address. *See* Alan D. Hornstein, *The New Maryland Rules of Evidence: Survey, Analysis and Critique,* 54 Md. L.Rev. 1032, 1054–56 (1995). Professor Hornstein, in respect to Rule 5–616, states:

> The division of parts (a) and (b) helps to clarify, though not completely resolve, the common-law problem of "collateralness." The common law prohibited the introduction of extrinsic evidence to impeach on collateral matters, but permitted it if the matter was not collateral. It was sometimes difficult to tell what counted as "not collateral." With respect to ... impeachment by contradiction, the problem remains, but the other modes of impeachment listed in Rule 616(b) permit proof by extrinsic evidence. In the parlance of the common law, these matters are not collateral.
>
> . . . .
>
> [The Rules] permit impeachment by contradiction.... [E]xtrinsic evidence of the contradictory material may be admitted only if the matter is not collateral or if the court exercises its discretion to permit extrinsic evidence of collateral matters. One might expect the exercise of such discretion where the matter is collateral in a strict sense but *forms the linchpin* of the witness's testimony. [Emphasis added, footnotes omitted.]

The term "collateral" is not defined in the rules themselves. In *Smith v. State,* 273 Md. 152, 328 A.2d 274 (1974), the Court of Appeals adopted a test to be utilized by the courts in determining whether a matter is collateral for purposes of impeachment. In that case, the state introduced the testimony of a police officer who arrived at the scene of the crime. On cross-examination, the police officer was asked whether he had told a member of the public defender's investigative staff

---

4. The author, a professor at the University of Maryland School of Law, acknowledges valuable contributions from Judge Alan Wilner, now of the Court of Appeals, and Professor Lynn McLain, University of Baltimore School of Law.

that the shooting was accidental; he denied having made the statement. In its case-in-chief, the defense sought to introduce the testimony of the member of the public defender's investigative staff with whom the officer spoke. The defense proffered that the witness would testify that the police officer told him that the officer had visited the victim in the hospital and that the victim had told the officer that the shooting was an accident. The trial court, indicating that the testimony constituted double hearsay, declined to admit it.

■ The Court of Appeals noted the test as to whether extrinsic evidence is collateral, laid down in *Attorney–General v. Hitchcock*, 1 Exch. 91 (1847), which held that "the proper test is whether the fact, as to which the error is predicated, could have been shown in evidence for any purpose independently of the self-contradiction." *Smith*, 273 Md. at 160, 328 A.2d 274. The *Smith* Court indicated that the rule in *Attorney–General v. Hitchcock* is applicable when the extrinsic evidence being offered for purposes of impeachment is otherwise inadmissible because it is irrelevant. The Court stated "where the inadmissibility of the extrinsic evidence, for a purpose independent of the contradiction, rests on grounds other than relevancy as, for example, in the present case, where it rests on the hearsay rule, different considerations govern." *Smith*, 273 Md. at 161, 328 A.2d 274. The Court went on to state:

> [T]he test of collateralness—whether the fact as to which the error is predicated could have been independently shown in evidence—actually means whether that fact could have been shown in evidence from the standpoint of relevancy. It is only in the context of relevancy that the rule accomplishes its underlying objectives. *The test, therefore, and we think it is foreshadowed by our earlier decisions, is whether the fact as to which the error is predicated is relevant independently of the contradiction; and not whether the evidence would be independently admissible in terms of satisfying all the rules of evidence.*

*Smith,* 273 Md. at 162, 328 A.2d 274. The Court concluded that "the testimony of the proffered witness with regard to the statement allegedly made to him by the police officer should have been admitted for the sole purpose of impeachment. For this purpose, it is not hearsay and, as we have observed, it is relevant." *Id.* at 162–63, 328 A.2d 274. We hold, accordingly, that "the test of collateralness ... means whether that fact could have been shown in evidence from the standpoint of relevancy." *Id.* at 162, 328 A.2d 274. If it can, it is not collateral.

■ Guided by the Court of Appeals's decision in *Smith,* we perceive the issue in the case *sub judice* to be whether the testimonial evidence of Messrs. Kahn and Harrison was relevant. Relevant evidence is defined as any "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Md. Rule 5–401.

■ This case concerns alleged defamatory statements made by appellee. Judge Karwacki, writing for the Court of Appeals in *Batson v. Shiflett,* 325 Md. 684, 722, 602 A.2d 1191 (1992), noted the elements of the tort of defamation: "The First Amendment of the United States Constitution requires that before a public figure may recover for defamation, clear and convincing evidence must establish that the statements in issue were: (1) defamatory in meaning, (2) false, and (3) made with 'actual malice.' " (Citations omitted.)

The alleged defamatory statements made by appellee related specifically to the jury's findings in each of the two prior civil cases. Appellant essentially asserts that the testimony of Messrs. Kahn and Harrison, in reference to the result and disposition of the prior civil actions, was irrelevant because the jury verdicts in each of the two cases were vacated. Appellant would have us hold that the jury verdicts and subsequent actions of the parties involved in the prior civil cases are not of consequence to her defamation action because the verdicts in

those cases were vacated and the cases subsequently settled. We disagree.

■ As expressed by Maryland Rule 5–401, in order for evidence to be relevant, it must 1) be of some consequence to the determination of the action, and 2) have some tendency to make a fact more or less probable. The alleged defamatory statements made by appellee concerned the prior jury verdicts. Accordingly, the jury verdicts and the facts surrounding the subsequent vacating of those verdicts were unquestionably relevant to determining whether appellee had made a true or false statement and, ultimately, whether appellee defamed appellant. The fact that the jury verdicts were vacated does not mean that they were never actually rendered. Additionally, the attorneys' testimony regarding the jury verdicts in the two cases, if believed, tended to show that the alleged defamatory statements and assertions were true. We, therefore, conclude that Messrs. Kahn's and Harrison's testimony was relevant. Accordingly, the testimony in the first instance concerned a noncollateral matter and was admissible to impeach appellant's credibility.[5]

■ Even if we were to assume that the testimony of Messrs. Kahn and Harrison might have been irrelevant and therefore collateral, Rule 5–616(b)(2) clearly permits the trial court, in its discretion, to admit extrinsic evidence for purposes of impeachment. As Professor Hornstein noted: "One might expect the exercise of such discretion where the matter is collateral in a strict sense but forms the linchpin of the witness's testimony." *Hornstein, supra* at 1056. It is clear, at a minimum, that the disposition of the two prior civil actions formed the "linchpin" of appellant's case against appellee.

---

**5.** In a footnote, appellant states in her brief: "Putting aside the collateral nature of the testimony, this testimony being fraught with hearsay is inadmissible on its face." Even though appellant failed to object on these grounds, we note that the Court in *Smith* held that hearsay testimony may be admitted for purposes of impeachment so long as it is relevant. Having found the testimony relevant, we need not address this contention further.

■ We are cognizant of a recent Court of Appeals opinion that discusses another reason why Messrs. Kahn's and Harrison's testimony was admissible. In *Clark v. State*, 332 Md. 77, 84–85, 629 A.2d 1239 (1993), Judge Chasanow noted Chief Judge Murphy's discussion in his Maryland Evidence Handbook concerning the distinction between "opening the door" and "curative admissibility." Judge Chasanow commented:

The "opening the door" doctrine is really a *rule of expanded relevancy* and authorizes admitting evidence which otherwise would have been irrelevant in order to respond to (1) admissible evidence which generates an issue, or (2) inadmissible evidence admitted by the court over objection. Generally, "opening the door" is simply a contention that competent evidence which was previously irrelevant is now relevant through the opponent's admission of other evidence on the same issue.

. . . .

In sum, "opening the door" is simply a way of saying: "My opponent has injected an issue into the case, and I ought to be able to introduce evidence on that issue." [Footnote omitted.]

Clark was being tried for rape. The defendant challenged the method used by the police in taking blood from the defendant for DNA testing. In response to that testimony, the State proffered the testimony of the officer who had taken Clark's blood sample. The officer inadvertently testified that he was taking blood for testing in a rape case other than the one for which Clark was on trial. In response, defense counsel attempted to ask the witness what had happened in the other rape case, and the State's Attorney objected. The trial court "ordered defense counsel to 'stay away from that other case.'" *Id.* at 83, 629 A.2d 1239. Ultimately, the Court held that the "opening the door" doctrine was not applicable because the exculpatory evidence, *i.e.,* DNA test results, that Clark sought to introduce was incompetent hearsay evidence.

In the case *sub judice*, however, the two civil law suits were the crux—the end all and be all—of appellant's case. Once

appellant injected the issue of "meaning" or "interpretation" as to what had occurred in those prior cases, she generated an issue as to the ultimate disposition of those cases. We do not perceive that the testimony of Harrison and Kahn was irrelevant in the first instance, even had appellant not presented her evidence on the matter. To the extent their testimony might have been irrelevant if offered for purposes other than contradiction, under the "opening the door" theory discussed by Judges Chasanow and Murphy, it would have been made relevant in any event. We perceive no error.

■  Finally, appellant asserts that the testimony of Messrs. Kahn and Harrison constituted improper opinion testimony. The transcript makes clear that appellant did not object below to the testimony on those grounds. Appellant's objection to the testimony related only to its collateralness. Her argument is therefore waived on appeal by her failure to present it at trial. Md. Rule 8–131.

## II.

### Did the circuit court err in refusing to find juror misconduct based upon the preparation of a trial notebook outside of the courthouse?

During the hearing on the Motion for New Trial, which was based in part upon the juror's alleged misconduct in preparing notes and his comments on the proceedings at home, appellant's counsel argued:

> *Your Honor, we haven't even had the opportunity to confront that evidence. We don't know what's in those notes. Without being able to examine them how can we confront them?* It ... brings to a conclusion that essentially you have somebody who has become the witness for one side or the other. In other words, when he gains that importance in becoming the witness, we didn't have the opportunity to cross-examine him. We didn't have the opportunity to confront him.
>
> . . . .

... Your Honor, I think that the further point is that, you know, essentially the fairness and the sanctity of the proceeding has been impaired and there is little possibility to put aside that there has been deviation from the Rule and that this has given again to one juror an inordinate amount ... of authority before the jury. I think, Your Honor, the ... thing we would like to do, I think the only way we really can address this as to whether or not the extrinsic evidence is a probability of prejudice *is to allow us to examine the notes because if we could examine the notes then we would be able to determine in how many ways those notes deviated from the record in this case and that would be the ... prejudice on the face of the extrinsic evidence.* I know we can't have a hearing, we can't go into the deliberative process, but we can go into what's on the face of the extrinsic information. And the face of the extrinsic information is—what I recall ... is a notebook this large, about an inch or two in ... depth, and it appeared to be organized with tabs and underlinings, and it appears to have been relied upon by the jury, even Mr. Bullard [the juror] in his ... note itself says that when he referred to his notes. [Emphasis added.]

On this issue, appellee's counsel's argument below was based on his position that to examine the extrinsic evidence would improperly involve the parties in the deliberative processes of the jury. At one point, however, appellee's counsel, himself, argued to the court:

*He added nothing to them except his own thought processes* which is exactly what is protected by Rule.

... Plaintiff's counsel should not have [an] opportunity to review them. . . . They make the bold allegation ... saying there is extraneous material brought into the jury room. . . . They have absolutely no facts to support that. [Emphasis added.]

Thereafter, appellant argued further:

Your Honor, I would note first that the Maryland Rules Commentary which we provided to the Court, has as part of

the annotation a statement that the notes should not be taken outside the courtroom because to do so would be to engage in homework and would be to engage in outside influence.... *I don't see any harm for us to review the notes. The only thing that we would determine by looking at the notes would become enlightened as to the probability [of] prejudice. To not allow us to view the notes is again to not allow us to confront evidence that was brought into the jury room.* It's that simple, Your Honor.... *[W]e have never had an opportunity to review that. Without that ability there is an inability really to argue the probability of prejudice* because we don't have a knowing platform from which to ... make that determination and to draw the Court's attention to it. I know the Court has reviewed those notes, *but I think we should also have the opportunity to confront everything* that was used by the jury in their deliberations against Ms. Aron. [Emphasis added.]

In its findings from the bench, the trial court said, in part: The question is whether this is extraneous matter. First, there are no tabs in the book. And in my reviewing of the book, ... it just appears to be just what it is, a [juror's] notes of the testimony and his impressions as to—he makes impressions, comments as to the credibility of witnesses, and he also makes notes about stuff that he doesn't understand like remittitur. He has a question mark over it where it was used. But these appear to be almost—at least to this Court's recollection, what you would expect the jury to take. *I'm not going to disclose it to Counsel. I believe that that would be allowing in the back door the can of worms that Judge R[o]dowsk[y], in writing the [Wernsing] opinion, was afraid of opening, but I'm going to retain it because if this case goes up on appeal and the appellate court wants it submitted it will be here.* But to allow the jury—or to allow Counsel, either Counsel, to inspect this I think would just be in violation of [*Wernsing* ]. So at first, I don't believe that it's extraneous matter. The fact that the individual is conscientious and decides to type his notes up, he's to be penalized for that? That's incredible. And even if it is

extraneous matter, which I don't—the probability of prejudice, why? Because they're typed up? Why does that make—what is he supposed to rely upon just his recollection? I don't think that there [is] that[ ] degree of probability of prejudice that would warrant a new trial. And for those reasons the Court[ wi]ll deny the Motion for a New Trial, the last remaining issue, for those reasons. [Emphasis added.]

In reference to sanctions, the court opined:

Now, under Maryland Rule [1–341], Mr. Gittner, I just—I'm not going to talk about good faith, but I think the Maryland law and the Maryland rules are crystal clear on this, and I do believe this aspect of the Motion of this hearing was without substantial justification under the rule. And having said that, under Maryland law, the application of the rule is mandatory. I'll be glad to submit whatever you want on the issue, but I will award Counsel fees for this Motion, and this aspect of the Motion, because the other aspects I've already denied.

After the trial court forbade the inclusion of the juror's notebook in the record, the following occurred:

THE COURT: ... I'm also indicating that I'm not filing the juror's notes in the file. That would allow access to the public and to Counsel. The Court is retaining—

[APPELLANT'S COUNSEL]: Your Honor, may I be ... heard ... on your ruling?

THE COURT: Yeah, sure.

[APPELLANT'S COUNSEL]: Your Honor, how could we not—how could we have brought this to your attention without filing the Motion?

THE COURT: I don't think there's any basis for the Motion. I think the Maryland law is clear. I think you're just trying to impeach the jury verdict under Maryland law, Mr. Gittner, and I think that's precisely what you were trying to do.

[APPELLANT'S COUNSEL]: *Your Honor, how would it be clear if we don't know what's in the notes? For*

*example, what if there had been an impropriety in those notes?* [Emphasis added.]

THE COURT: Mr. Gittner, no. I'm sorry, my ruling will stand.

Before further addressing the law in reference to this issue, we must address the state of the record forwarded to us and how it impacts upon our review. The notebook at issue here has been lost, and the parties, absent the opportunity to review it below, could not, in this appeal, possibly reconstruct its contents because the trial court denied them the opportunity at the hearing to examine it. This, of course, creates an additional problem because of the nature of this appeal. Just as the two prior civil cases were the "linchpin" of appellant's case, this notebook was the "linchpin" of her Motion for New Trial.

We are unaware of any case exactly on point, in which determinative, unexamined documents have been lost through no fault of the parties. Accordingly, we look to the cases, with some similarity to the facts of the case *sub judice*. These cases generally concern delayed transmittal or inadequate records.

*Owens–Illinois, Inc. v. Zenobia*, 325 Md. 665, 667, 602 A.2d 1182 (1992), on Motion for Reconsideration, was a case in which one of the defendants, in a motion to reconsider, requested that certain documents "'... be made part of the total record'" and that, with the documents as a part of the record, the Court's prior decision be reconsidered.

The Court's prior opinion had held that a defendant was not entitled to indemnification or contribution from another defendant because that other defendant had never been properly named as a defendant or third-party defendant. In its motion for reconsideration, the movant argued that the page of the complaint naming the other defendant as a party had inadvertently been omitted from the record extract. The Court of Appeals noted:

Neither the original complaint in the *Zenobia* case, nor the stipulation as to cross-claims, nor Anchor's cross-claims

for indemnity were included in the record on appeal transmitted to this Court pursuant to Maryland Rules 8–412 and 8–413. The original complaint, apparently with a page missing, and a portion of the cross-claim stipulation, were included in the record extract under Rule 8–501. These partial documents indicated that Raymark had never been a party in the *Zenobia* case. Anchor's proffered cross-claims for indemnity against "all defendants" was not included in the record extract.

*Zenobia,* 325 Md. at 668, 602 A.2d 1182. The Court then corrected the record:

> Since the exhibits attached to Anchor's Motion for Reconsideration indicate that the plaintiff Zenobia had named Raymark as a defendant and that Anchor had filed cross-claims for contribution and indemnity against all defendants, including Raymark, we shall pursuant to Rule 8–414 correct the record to include these papers, and we shall proceed on the basis that the cross-claims were filed against Raymark in the *Zenobia* case.

*Zenobia,* 325 Md. at 668, 602 A.2d 1182 (footnote omitted). It, however, declined to change its prior opinion and denied the motion to reconsider based upon the facts of the case:

> Nevertheless, we shall not modify the judgment vacating the circuit court's granting of the cross-claims against Raymark in the *Zenobia* case, and we shall deny Anchor's Motion for Reconsideration. As in the *Dickerson* case, the evidence in the *Zenobia* case was insufficient to show that Raymark was a joint tortfeasor.

*Id.* at 669, 602 A.2d 1182.

In the case *sub judice,* on our own motion, we ordered the Clerk of the Circuit Court for Anne Arundel County to correct the record by forwarding to us the "notebook" at issue. The clerk has informed us that he cannot comply because the "notebook" cannot be found. This record, unlike the record in *Zenobia,* cannot be corrected by an appellate court because the notebook cannot be made a part of the record as it was lost.

■  The general rule is that an appeal will not be dismissed if the delay in transmittal of the record is occasioned by the neglect, omission, or errors of the court or its staff. *See Horseman v. Furbush*, 124 Md. 581, 582, 93 A. 149 (1915) (noting that an appeal will not be dismissed if the delay was caused by the " '. . . neglect, omission or inability of the clerk or appellee . . .' "); *Wilson v. Merryman*, 48 Md. 328 (1878) (holding "we are of opinion that no fault or *laches* can be imputed to the appellant's counsel, in the failure to transmit the record within the time prescribed by the Rule, and therefore the motion to dismiss is overruled"); *Hooper v. Baltimore & Y. Turnpike Rd.*, 34 Md. 521, 529 (1871) (stating "[t]he proof offered . . . shows that the delay . . . was not caused by the fault or latches of the appellant"); *cf. Nationwide Motor Sales Corp. v. Trusty*, 24 Md.App. 407, 331 A.2d 76 (1975) (dismissing appeal when absence of transcript was not caused by neglect, omission, or inability of the clerk of the lower court); *Laukenmann v. Laukenmann*, 17 Md.App. 107, 109, 299 A.2d 466 (1973) ("There is no contention that the failure . . . was occasioned by the neglect, omission or inability of the clerk. . . ."); *White v. State*, 8 Md.App. 51, 54, 258 A.2d 50 (1969) (affirming trial court's denial of motion to change venue because the record was "silent as to what transpired at the hearing on his motion"), *cert. denied*, 257 Md. 737 (1970).

Although Maryland Rule 8–412(d) concerns the transmittal of the entire record, as contrasted with the failure to include a part of it as in the case at bar, it, nevertheless, sheds some light on the Court of Appeals's general position on clerical omissions. The rule states, in pertinent part, in respect to the filing of a motion to extend time to transmit the record after the time for transmittal of the record has expired: "[T]he Court will not extend the time unless the Court finds that the failure to transmit the record was caused by the act or omission of a judge, a clerk of court, the court stenographer, or the appellee." Md. Rule 8–412(d). The Court of Appeals was concerned with the application of the predecessor rule to Rule 8–412(d), Rule 1025(d), in *Uhler v. Real Properties, Inc.*, 289 Md. 7, 421 A.2d 966 (1980). There, the Court traced the

history of the provision "going back more than one and a quarter centuries." *Id.* at 12, 421 A.2d 966. The Court stated:

> Thereafter, this Court revised the proposed rules by removing from the trial courts the power to grant extensions and by enlarging the basic period for record transmittal to 60 days. Of particular significance here is that the class of persons whose "neglect, omission or inability" could occasion and excuse delay was [expanded] to include a judge of the Court of Special Appeals in Rule 1025, and, in a companion amendment to Rule 825, a judge of this Court. Former section b of Rule 1025 was deleted, former section c was relettered to "b" and Rule 1025 was adopted in the form extant at the time relevant to the subject appeal. 2 Md. Reg. 983, 987, 994 (June 25, 1975).
>
> ... Even more fundamental is that present section c of Rule 825, from which Rule 1025 c was cloned, has stood intact since 1957 and embodies an historic policy designed to protect, in appropriate cases, against dismissal of appeals because of specified types of delay in record transmittal.
>
> . . . .
>
> ... If the existence of excusing conditions asserted in the motion for extension is not controverted, or, if controverted, it appears to the Court of Special Appeals that the delay was occasioned by the neglect, omission or inability of a judge of that court, the clerk of the lower court, the court stenographer or the appellee, then the appeal cannot be dismissed for failure to transmit the record within the time prescribed. Rule 1025 c.
>
> . . . .
>
> In the instant matter the Uhlers had demonstrated in their motion for extension of time which was filed one court business day late, in their motion to strike the order denying the extension, and in their opposition to RPI's motion to dismiss that the failure to transmit the record within the time prescribed had been occasioned by the inability of the

court reporter. It was therefore error for the Court of Special Appeals to dismiss the appeal.

*Id.* at 18–22, 421 A.2d 966 (footnotes omitted).

The issue of an incomplete record was addressed in *King v. State Rds. Comm'n,* 284 Md. 368, 396 A.2d 267 (1979). There, the Court stated:

In so stating, however, we nonetheless find we are unable to discern if petitioners are entitled to this relief because the record leaves uncertainty as to whether a timely objection was made. The Kings contend they made two seasonable objections. . . . Thus, the issue before us is relegated to an inquiry as to whether an objection was made prior to the jury being sworn. In this regard, the trial transcript reflects that immediately prior to the administration of the oath to the jury there was a bench conference, the content of which was not recorded by the court reporter. As a consequence, the record tells us nothing concerning what took place at that conference.

We have previously recognized that if a party thinks the record in this Court is incomplete or incorrect, the proper remedy is to file a motion here under Rule 826 f to correct that record. *Harmon v. State,* 227 Md. 602, 607, 177 A.2d 902 (1962). The Kings have not explicitly made such a motion, but we think that when, as here, the record is incomplete through no apparent fault of the appealing party and there is some indication in the record that tends to support that party's assertion that, in fact, a timely objection was made, "the purposes of justice will be advanced by permitting further proceedings in the cause" to determine the issue, Md. Rule 871, and thus we will treat petitioners' assertions as a Rule 826 f motion and remand the case, as is provided in Rule 826 c, for certification by the trial court as to what occurred. On remand, if, after considering the record, the arguments of counsel, any trial notes he retained, or any other legitimate source, the trial judge's recollection is refreshed to the extent that he can certify as to what occurred with regard to the alleged objection, the following action should take place: If the court finds the

petitioners did not make a timely objection, as specified by this opinion, the judgments previously recorded on May 4, 1978, should be reentered; *however, if it finds such an objection was registered before the jury was impaneled, a new trial should be provided.* On the other hand, if the trial judge is unable to reach a conclusion as to whether a timely objection was made, then, in that event, a new trial should be conducted.

*King,* 284 Md. at 372–75, 396 A.2d 267 (footnotes omitted) (emphasis added).

■ In the case *sub judice,* we are unable to discern whether the trial judge would be able to recreate the record in the event we were to remand. Neither can the parties' attorneys create the record on this issue, absent some means not immediately apparent, because they never had the opportunity to examine the notebook. As we perceive the situation, to dismiss an appeal of this nature because the trial court lost crucial exhibits it represented to the parties would be available, on the basis that it is appellant's responsibility to make the record—especially when appellant was denied the right at trial to examine the exhibit—would not be in the interest of justice. We decline to dismiss the appeal *sua sponte* on the ground of the inadequacy of the record under the circumstances here present.

To aid us further in our inquiry as to the correct resolution of this procedural problem, we shall examine two cases that involve appellate review of a motion for new trial based on alleged juror misconduct. In *Harford Sands, Inc. v. Groft,* 320 Md. 136, 577 A.2d 7 (1990), a juror was alleged to have violated a trial court's instruction by going to a construction site during the trial and making an independent investigation of a concrete pumping machine. The juror was questioned and admitted taking the independent action that the trial court had forbade. Two construction workers testified that the juror had questioned them about the machine's capabilities. Based upon the juror's admitted transgression, a Motion for New Trial was filed. The Court of Appeals opined:

O'Keefe [the juror], of course, misbehaved when he talked to the workmen. "[I]t is highly improper for jurors to discuss with outsiders a case on trial before them...." *Joseph F. Hughes v. Stockhausen,* 212 Md. 559, 562, 129 A.2d 844 (1957). But the question before us is not whether or how O'Keefe should be punished for his misconduct. It is whether the circuit court judge abused his discretion when he denied Harford Sands a new trial. *In deciding that issue, we are constrained to look at the record that was properly before that judge.*

... Finally, there was nothing before the judge to show that O'Keefe had disclosed to his fellow jurors any information about concrete pumping machines or any views about the credibility of expert Schafer, or that he had played any part, leading or otherwise, in persuading the jury to bring in its $4,000 verdict.

320 Md. at 144, 577 A.2d 7 (emphasis added.) Likewise, in *State Deposit Ins. Fund Corp. v. Billman,* 321 Md. 3, 580 A.2d 1044 (1990), the trial court and the appellate court were able to assess what, if any, extrinsic matter had been placed before the jury and thus were able to make prejudice assessments.

In the case *sub judice,* we cannot make the inquiry the Court of Appeals made in *Harford Sands* and *State Deposit.* That which is the foundation of our inquiry, the notebook, has been lost. Without it, we cannot determine whether there were extraneous matters, and, if so, the probability of prejudice resulting therefrom.

In a case involving a motion to strike an enrolled judgment, the trial court had not fully articulated its reasons for its judgment. Judge Wenner, for this Court, in *Greer v. Inman,* 79 Md.App. 350, 355–57, 556 A.2d 1140 (1989), opined:

A careful review of the record reveals that, when the circuit court denied appellant's post-trial motions, the court only articulated its finding with respect to appellant's right to participate in the hearing on damages. The court did not articulate its reason for denying appellant's motion to re-

vise.... Accordingly, we are unable to say whether the court acted properly in denying appellant's motion to revise.

Ordinarily, it is the responsibility of the parties to provide a proper record. We have previously recognized, however, that when "the record is incomplete through no apparent fault of the appealing party ... the purposes of justice will be advanced by permitting further proceedings in the cause."

... [W]e do not think it was appellant's fault that the lower court failed to articulate the reasons for its denial of appellant's motion to revise, because the motion was denied without a hearing. We shall, therefore, remand the case to the circuit court for further proceedings. [Citation omitted.]

*See also King,* 284 Md. at 375, 396 A.2d 267; *Dishman v. Dishman,* 59 Md.App. 435, 441–42, 476 A.2d 213 (1984). *But see Vernon v. State,* 12 Md.App. 157, 164, 277 A.2d 635 (1971) (holding that, in the absence of record relative to proceedings concerning illness of juror during deliberations, "we must assume that [the trial court] dealt with it properly").

In the case at bar, the trial judge informed the parties that the notebook was not going to be kept with the rest of the record, but that it would be available for forwarding to us, if we perceived a need to review it. There was no reason for appellant to surmise that that which would be crucial for our review, would, through no fault of appellant, become unavailable. Had the notebook come to us with the rest of the record, we would have a basis for determining whether the circuit court in its review abused its discretion. If a trial court can, unintentionally, stymie appellate review of its discretionary actions, then appellate oversight can be denied from below. That would be inappropriate. We perceive, under the circumstances of this case, that the "purposes of justice" will be advanced by remanding this case to the trial court for additional proceedings that may serve to correct the record. We will further explain, *infra.*

██ Although the loss of the notebook forecloses our present ability to review, unless the record can subsequently be corrected, and will result in a new trial, we are cognizant of a matter still subject to appellate review. The question we are able to review is: Did the trial court commit reversible error or did it abuse its discretion in declining to allow appellant's trial counsel to examine the notebook to determine whether the notebook contained extrinsic, extraneous, or other inappropriate matter? In remanding this case, we shall direct the trial court, if it becomes available, to afford the parties an opportunity to examine the notebook. The method we suggest will also be discussed *infra*. But first, we need to discuss further other relevant legal principles.

For the guidance of the trial court on remand, we next comment on the standard of review in cases that involve motions for new trial based on allegations of juror misconduct. We shall then examine the law relative to evidence concerning impropriety during jury deliberations.

██ In *Buck v. Cam's Broadloom Rugs, Inc.*, 328 Md. 51, 612 A.2d 1294 (1992), the Court of Appeals, quoting *Mack v. State*, 300 Md. 583, 600, 479 A.2d 1344 (1984), restated the standard of review of the trial court's decision on a new trial motion:

> The question whether to grant a new trial is within the discretion of the trial court. Ordinarily, a trial court's order denying a motion for a new trial will be reviewed on appeal if it is claimed that the trial court abused its discretion.

*Buck,* 328 Md. at 57, 612 A.2d 1294. In *Buck,* the trial court granted a new trial, and the Court discussed the nature of a trial court's discretion in respect to new trial motions:

> [T]he emphasis has consistently been upon granting the broadest range of discretion ... whenever the decision ... depended upon ... evaluation of the character of the testimony and of the trial when the judge is considering the core question of whether justice has been done....
>
> ... [W]here competent extrinsic evidence discloses that a jury's consideration ... was seriously distorted by informa-

tion that should not have been before the jury, a trial judge may have little or no "discretion" to deny a new trial.

*Id.* at 57–58, 612 A.2d 1294; *see also Manders v. Brown,* 101 Md.App. 191, 201, 643 A.2d 931 (holding that when the trial court found that "the jury's verdict 'was seriously distorted by information that should not have been before [it],' . . . the court had 'little or no "discretion" to deny a new trial' ") (quoting *Buck,* 328 Md. at 58, 612 A.2d 1294), *cert. denied,* 336 Md. 592, 650 A.2d 238 (1994); *cf. Owens–Corning Fiberglas Corp. v. Mayor of Baltimore,* 108 Md.App. 1, 29, 670 A.2d 986, *cert. denied,* 342 Md. 472, 677 A.2d 565 (1996) (upholding trial court's denial of motion for new trial based on alleged juror misconduct because movant "did not demonstrate any extraordinary or compelling reasons requiring the grant of a new trial").

The cases in which matters relating to impropriety during jury deliberations have been presented on appeal appear, generally, to be divided into two broad classes: (1) when a juror, post-verdict, is responding to an inquiry by counsel as to an impropriety in the method of the jury's deliberations; and (2) when there is independent evidence not solicited from nor emanating solely from the jurors, available to the trial court, that extraneous and improper matter has been introduced into jury deliberations and that extraneous matter can be interpreted to have conflicted with instructions or properly admitted evidence, so that prejudice "probably" resulted.

In respect to the first class, the law is clear and would apply to most, but not all, of the material evidence on this issue in the case *sub judice.* This first class was discussed extensively in our case of *Braun v. Ford Motor Co.,* 32 Md.App. 545, 551–54, 363 A.2d 562, *cert. denied,* 278 Md. 716 (1976),[6] in which we discussed the then current Court of Appeals's cases on this class of jury problems:

---

**6.** The Court in *Braun* did not separately discuss the matter of a juror's discussion of a newspaper article.

An exhaustive discussion of the rule that a juror will not be heard to impeach his verdict is found in the opinion written by Chief Judge Soboloff for the Court of Appeals in *Williams v. State*, 204 Md. 55, 102 A.2d 714 (1954). The Court said, at 67–68, 102 A.2d 714:

"The law in Maryland is well settled that a juror cannot be heard to impeach his verdict, whether the jury conduct objected to be misbehavior or mistake. *Browne v. Browne*, 22 Md. 103, 113 [ (1864) ]. The reasons for the rule have been stated by this Court in *Brinsfield v. Howeth*, 110 Md. 520, 530, 73 A. 289 [ (1909) ], in these impressive words: 'Such evidence is forbidden by public policy, since it would disclose the secrets of the jury room and afford an opportunity for fraud and perjury. . . . It would be a most pernicious practice, and in its consequences dangerous to this much valued mode of trial, to permit a verdict, openly and solemnly declared in the Court, to be subverted by going behind it and inquiring into the secrets of the jury room.'

"Other risks sought to be averted, it has been said, are harassment of jurors by disgruntled losing parties; removal of an element of finality from judicial decisions; and through allowing jurors to swear to alleged examples of reprehensible conduct, a decrease in public confidence in the judicial process. In an offer to prove facts nullifying the verdict on a motion for a new trial, the theory for exclusion of the jurors' deliberations during retirement, their expressions, argumented, motives, and beliefs, may, according to Prof. Wigmore, embrace both the Privileged Communications Rule and the Parol Evidence Rule. 8 *Wigmore, Evidence*, Secs. 2346, 2348." . . .

. . . .

In *Williams* the Court of Appeals summarized, at 70, 102 A.2d 714:

. . .

"In Maryland there has been no deviation from the rule that what takes place in the jury-room ought to be, as it

generally is, known only to the jurors themselves and that *their testimony* cannot in general be heard to impeach their verdict, whether the conduct objected to be misbehavior or mistake."

And at 72, 102 A.2d 714 the Court said:

"It suffices to say that under the Maryland law the affidavit of a juror is inadmissible as evidence at the hearing on the motion for a new trial, and there is no sound basis for a distinction between civil and criminal cases in this regard." [Emphasis added.]

In *Dixon v. State*, 27 Md.App. 443, 449, 340 A.2d 396, *cert. denied*, 276 Md. 741 (1975), we reviewed the authorities, including *Williams v. State, supra*, and held, with respect to a post-trial affidavit obtained from a juror, that the trial judge "did not abuse his discretion in refusing to consider the affidavit, nor in declining to hear testimony relative thereto." We had earlier noted in *Dixon* that the Supreme Court had relaxed Lord Mansfield's Rule "and accepted a distinction between the juror's mental processes and extraneous acts which influence the juror's decision. The Court allowed evidence as to the latter and not the former." *Id.* at 447, 340 A.2d 396. We went on in *Dixon* to construe the matter there to be of the first class and upheld the trial court's rejection of the juror's affidavit and post-trial testimony. *See also Kelly v. Huber Baking Co.*, 145 Md. 321, 125 A. 782 (1924) (upholding inadmissibility of juror affidavit that stated one of the attorney's brothers had discussed with the juror certain testimony); *Brinsfield v. Howeth*, 110 Md. 520, 73 A. 289 (1909) (upholding inadmissibility of juror's affidavit that other juror intimidated and threatened him); *Browne v. Browne*, 22 Md. 103 (1864) (rejecting affidavits of jurors, including Juror A, which stated that Juror A and three other jurors voted for the verdict so that Juror A could obtain relief from a bowel disorder); *Bosley v. Chesapeake Ins. Co.*, 3 G. & J. 450 (Md.1831) (rejecting juror's affidavit in "loss of ship" case).

In the case *sub judice*, the issue that concerns us was not the use of a juror's affidavit as to what occurred during

deliberations. It is the second class of cases—material extrinsic to the court and jury room. Here, it is undisputed that a juror kept a notebook that was compiled at home, contained some of the juror's thought processes, and that it was improperly taken into the jury room where it was used during deliberations.

We note that we know of no authority that would support the trial court's post-verdict denial of access to the notebook. At that point, the jury's deliberative processes were complete, and the jury had been discharged. The only issue before the trial court at that point[7] was whether the notebook contained extraneous, extrinsic, or other improper matter and, if so, whether it was probably prejudicial. We fail to perceive how appellant could adequately present her position when examination of the major relevant item of evidence central to the position she took in her motion for new trial was denied to her. It was that very evidence that the trial court relied on in ruling against appellant on this issue.[8] It is clear that appellant vigorously fought for the right to examine the notebook. We include a substantial portion of the exchanges that occurred at the hearing on appellant's Motion for New Trial.

THE COURT: Okay. Mr. Gittner [appellant's counsel], I've denied all Motions for a new trial with the exception of the one dealing with the alleged juror misconduct.

. . . .

[APPELLANT'S COUNSEL]: ... Your Honor, let me get to that if I could. . . . I think there's no question that the notes were prepared outside the courtroom. I think there's no question that they were prepared in a delibera-

---

7. Having previously denied the Motion for New Trial based on the other grounds, the trial court heard only the matter relating to the notebook and Rule 1–341 sanctions.

8. We limit our discussion to the denial of access to the notebook. The cases we discuss elsewhere, in our opinion, would suggest the trial court's determination not to utilize any affidavits of jurors or any evidence resulting from telephone communications with jurors was correct.

tive manner, apparently each of the evenings by Mr. Bullard (phonetic) at his computer. I think there's no question that each night he deliberated with regard to the testimony that had been presented that day, and I think there's little doubt that engaging in that deliberation required that he conduct an analysis of the testimony and of the evidence. And I think it's that analysis, Your Honor, that is extraneous. In other words, in contravention of the Court's instructions that the jurors wait until all the evidence was in Mr. Bullard ... by re-evaluating the testimony, had to have done an analysis of the testimony and had to have begun to deliberate.

. . . .

THE COURT: Mr. Gittner, the Maryland Rules permit a juror to take notes.

[APPELLANT'S COUNSEL]: They don't allow homework though, Your Honor. I think that's clear under the Rule's commentary. And what happened here was that by taking these notes home—there's a distinction between Bullard's notes and the notes of a juror.

. . . .

... [B]y taking the notes home and putting them into the computer and coming into the jury room with a compendium, an analysis, a digest of the testimony, Mr. Bullard became the key and dominant juror.

... *[A]nd I use this by way of example to show the probability of prejudice because I haven't seen the notes. I've been unable to determine exactly in which [ways] these notes for example may have differed from the testimony.*

After discussing a communication he had had with another juror, a communication that would have been inadmissible under the Maryland cases, appellant's counsel continued:

Now, that's only by way of example, because *I haven't seen the note[book], so I'm not able to even corroborate whether or indeed that is ... accurate.* But if it is accurate, Your Honor, that is the very prejudice that is—that it arouses.... [A]nd it's not Ms. A[ ]ron's fault what he's

done, not Mr. Brock's fault, but it's certainly not Ms. Ar[ ]on's fault what has been done, is that he has engaged in something outside the courtroom. He has engaged in deliberating and analyzing the testimony which—which this Court did not permit. The Court was very clear that they should not begin their deliberations. And once that—you know, once that—those notes become the—the authoritative source, then they are intrinsic evidence, *and it's intrinsic evidence because number one, Your Honor, we haven't even had the opportunity to confront that evidence. We don't know what's in those notes. Without being able to examine them how can we confront them?* . . .

. . . .

*. . . I think the only way we really can address this as to whether or not the extrinsic evidence is a probability of prejudice is to allow us to examine the notes because if we could examine the notes then we would be able* to determine in how many ways those notes deviated from the record in this case and that would be the—the prejudice on the face of the extrinsic evidence.

Opposing counsel then, as relevant to this issue, commented:

The law is clear, Rule 5[-]606 clearly indicates that you can't invade the deliberative process of the jury and that is exactly what is being attempted here. . . .

What Counsel wants is to [look] at . . . Mr. Bullard's notes, I should say, and that is clearly an invasion of the process. He has given those notes to Your Honor. *You have had an opportunity to review them. This gentlemen has told Mr. Cotton as well as myself that his notes are nothing more than his efforts to do a diligent job as a juror. He would take his written notes at night, go home and type them out so that they were legible and understandable viewing the length of the trial. He had no extraneous matter in them. He added nothing to them except his own thought processes which is exactly what is protected by Rule.*

*. . . Your Honor has had the notes.  You know what's in them* and you know they're nothing more than the man's notes.  There's no extraneous material at all, and as such the Court in camera can make that decision, and if there is no extraneous material then this Motion should fail on its face.

*Now, to allow Plaintiff's Counsel to peruse these notes willy-nilly to go through them to try and create some basis for an appeal I think is—is exactly what the Rule prohibits.* This has been overworked by—you know, as far as I'm concerned, the borderline of ethical misconduct in terms of what was done, how it was done in terms of approaching these jurors, misrepresenting the facts and now raising this in a Motion for New Trial.

Appellee's counsel, in his last comments, missed the argument being made by appellant.  Appellant's argument was not that she should be able to review the properly preserved notes made, and kept, in court but that, because the juror had summarized and prepared the notes out of court and then taken them into the jury room, she had the right to examine them to insure that extraneous matter had not been included in the extrinsic notebook.  Appellee's counsel continued:

[The juror]'s notes should not be released.  They are clearly within the province of the Court and *they're not the sort of thing that warrant any inspection by anyone if the Court is satisfied that there is nothing improper in those notes.  We would object to the release of those notes in any fashion.*

In rebuttal, appellant's trial counsel responded:

Your Honor, I would note first that the Maryland Rules Commentary which we provided to the Court, has as part of the annotation a statement that the notes should not be taken outside the courtroom because to do so would be to engage in homework and would be to engage in outside influence.  I think that was in there for a specific reason, precautionary reason for example—for exactly the—the type of problem we're engaged in today.  *I don't see any*

*harm for us to review the notes. The only thing that we would determine by looking at the notes would become enlightened as to the probability [of] prejudice.* To not allow us to view the notes is again to not allow us to confront evidence that was brought into the jury room. It's that simple, Your Honor.

Ultimately, the trial court made the findings that we have previously discussed. If we had the opportunity to review that which the trial court reviewed, we might well agree that his ultimate decision was within the accepted range of his discretionary power. The trial court stated, however, that "I'm also indicating that I'm not filing the juror's notes in the file. That would allow access to the public and to Counsel."

In *Wernsing v. General Motors Corp.*, 298 Md. 406, 470 A.2d 802 (1984), it was alleged that juror affidavits indicated that, not only was a dictionary taken into the jury room, but that the foreman had used the dictionary's definition of the term "legal" to change juror's votes. The Court of Appeals first noted that it was improper for the juror affidavits themselves to be used to impeach the jury's verdict. It noted that in *Oxtoby v. McGowan*, 294 Md. 83, 101, 447 A.2d 860 (1982), it had "reiterated the well-settled Maryland rule that *a juror* cannot be heard to impeach his verdict." *Wernsing*, 298 Md. at 411, 470 A.2d 802 (emphasis added).

The *Wernsing* Court, however, went on to opine:

On the other hand, the testimony of the bailiff presents "a different situation" and is competent. Similarly, the jury notes, hereinafter described, are competent proof. As documents generated during the jury's deliberations, they do not suffer the taint of possible *post-verdict importuning.* Whether respondents have even established that extraneous matter was before the jury must be answered within a framework limited to those two evidence categories.

. . . After the verdict was rendered, these were given by the bailiff to the court clerk and retained by the clerk, in an envelope marked "jury notes," until the hearing on the new trial motion. . . .

... The issue is whether this record, *when consideration is limited to the bailiff's testimony and the jury notes,* demonstrates an abuse of discretion in denying the new trial motion.

*Id.* at 413–14, 470 A.2d 802 (emphasis added). The Court later opined:

Petitioners, however, argue that the Casto notation fails to prove prejudice, particularly because its effect, if any, on any juror is unknown, once the affidavits have been excluded from consideration. In effect petitioners urge that prejudice can only be shown by demonstrating that one or more jurors were in fact influenced by legally incorrect matter found in a dictionary.... *[M]eeting such a standard would seem to be impossible because, in Maryland, direct evidence of the effect of the extraneous material on any juror's decision could not be presented to upset the verdict.*

*Id.* at 418, 470 A.2d 802 (emphasis added)

The *Wernsing* Court then discussed a similar case from Illinois, *Gertz v. Bass,* 59 Ill.App.2d 180, 208 N.E.2d 113 (1965):

[T]he only competent evidence in [*Gertz* ] showed that the jury had requested and received a dictionary which was later made an exhibit on the new trial motion. Comparison of key terms in the court's charge, involving a guest statute, with those terms as defined in the dictionary reflected substantial differences and consequently a potential for prejudice.

*Wernsing,* 298 Md. at 418, 470 A.2d 802. The Court also referred to the New Jersey case of *Palestroni v. Jacobs,* 10 N.J.Super. 266, 77 A.2d 183 (App.Div.1950), noting:

The court, through an opinion by then New Jersey Superior Court Judge William Brennan, held that

the test whether a new trial will be granted is whether the extraneous matter could have a tendency to influence the jury in arriving at its verdict in a manner inconsistent with the legal proofs and the court's charge. If the extraneous matter has that tendency on the face of it, a

new trial should be granted without further inquiry as to its actual effect.

*Wernsing,* 298 Md. at 419, 470 A.2d 802. The *Wernsing* Court ultimately held:

The Court of Special Appeals clearly identified the problem in the instant case. It is to balance the right to a fair trial with the policy prohibiting impeachment by a juror of the verdict. Where, as here, the precise extraneous matter is known but direct evidence as to its effect on the deliberations is not permitted, a sound balance is struck by a rule which looks to the probability of prejudice from the face of the extraneous matter in relation to the circumstances of the particular case. It is the function of the trial judge when ruling on a motion for a new trial to evaluate the degree of probable prejudice and whether it justifies a new trial. That judgment will not be disturbed but for an abuse of discretion. *Id.* at 419–20, 470 A.2d 802.

We examine another case of alleged jury misconduct. In *Smith v. Pearre,* 96 Md.App. 376, 625 A.2d 349, *cert. denied,* 332 Md. 454, 632 A.2d 151 (1993), the jurors had been repeatedly instructed by the trial court not to listen to radio or television broadcasts concerning any medical subjects. During the trial, the television program "60 Minutes" broadcast a segment on physicians "who had left the profession." One of the party's attorneys hired an investigator to determine whether any of the jurors had viewed the program. The trial court stated: "What appellant's [c]ounsel did . . . is precisely what the rule attempts to avoid." *Id.* at 388, 625 A.2d 349. We then noted that

the foreman's observance of the program constitutes extraneous material that occurred outside the sanctity of the jury room. *Therefore, evidence of the foreman's observance of the program may be properly considered by the trial court,* but the court may not consider what occurred during jury deliberations. [Emphasis added; citation omitted.]

*Id.* at 390, 625 A.2d 349. Ultimately upholding the trial court's decision, we reasoned:

Keeping in mind that we must balance "the probability of prejudice from the fac[e] of the extraneous matter in relation to the circumstances of the particular case," we conclude that while it was *possible* that the "60 Minutes" segment influenced the jury foreman we are not convinced that it *probably* resulted in prejudice. We find no abuse of discretion in the trial court's decision to deny a motion for new trial. *Compare Braun v. Ford Motor Co.*, 32 Md.App. 545, 550–51, 363 A.2d 562 (1976) (juror who knew member of law firm representing appellee not asked to disclose acquaintance during voir dire).

*Smith,* 96 Md.App. at 391, 625 A.2d 349.

In an earlier second class of misconduct case, the Court of Appeals found no prejudice and affirmed. Among the issues in *Christ v. Wempe,* 219 Md. 627, 640, 150 A.2d 918 (1959), was the independent evidence that during juror deliberations " '[t]he Forewoman ... asked the following question [of the court clerk outside the jury room], if we answer the Issue A ... No, do we have to answer the rest of the issues....' " The clerk, outside of the presence of the court and the parties, responded, "No." The evidence of this exchange was presented to the court not through an affidavit of a juror but through the court clerk's affidavit. The Court initially discussed briefly the line of cases concerning the first class of cases, *i.e.,* jurors attempting to impeach their verdict, and then noted the difference between those cases and the one it was addressing:

The information contained in the affidavit of the court clerk presents a different situation because it emanates from one not a member of the jury panel and is based on his own knowledge. Such evidence should be received and considered by the court in ruling on a motion for a new trial.... [The trial judge] did consider the facts stated in the affidavit to be true but decided that the irregularity therein described was insufficient to justify a new trial.

*Id.* at 642, 150 A.2d 918 (citation omitted).

Without deciding whether the trial court's decision was even subject to review, the Court noted that the court clerk's reference to the question had been "in accordance" with the

trial court's instructions. It, therefore, in essence, held that there was no probability of prejudice and stated, "[t]he misconduct must be such as to justify the belief that the fairness of the trial is impaired and injury resulted." *Id.* at 642–43, 150 A.2d 918.

In *Harford Sands, Inc. v. Groft,* 320 Md. 136, 577 A.2d 7 (1990), the Court, distinguishing *Wernsing,* stated:

> We allowed [in *Wernsing* ] the testimony of a bailiff to the effect that the jury foreman had asked for a dictionary and that the bailiff had procured one and had handed it to the foreman. 298 Md. at 413–414, 470 A.2d 802. The affidavits of Scherer and Turner are like the bailiff's testimony. They do not recount anything that happened in the jury room or the nature of the jury deliberations. They bear only on what one juror said and did outside the courthouse. *See also Christ v. Wempe,* 219 Md. 627, 642, 150 A.2d 918 (1959). That also is true of O'Keefe's statement that he conversed with the workmen during the lunch break. These evidentiary materials were properly considered by the trial judge.
>
> . . . .
>
> Here all we know is that O'Keefe obtained extraneous information about the capabilities of concrete pumps that was inconsistent with Schafer's testimony. *We do not know that O'Keefe himself applied this information. We do not know that it was made available to any other member of the jury.*

*Harford Sands,* 320 Md. at 145–47, 577 A.2d 7. The Court concluded:

> While it is possible that this conclusion might have been the result of the improper influence of extraneous material, on this record, we cannot say that the concrete pump information probably resulted in prejudice to Harford Sands. In short, we see no palpable injustice here. The trial judge did not abuse his discretion when he denied the motion for a new trial.

*Id.* at 150, 577 A.2d 7.

In *State Deposit Ins. Fund. Corp. v. Billman,* 321 Md. 3, 580 A.2d 1044 (1990), unadmitted documents were erroneously

taken into the jury room along with 1,138 admitted exhibits. We had held in our review, 80 Md.App. 333, 563 A.2d 1110 (1989), that " 'prejudice to the parties is presumed.' " 321 Md. at 15, 580 A.2d 1044. The Court of Appeals disagreed and, referring to the standard applicable to the erroneous admission of evidence, stated that " 'what constitutes prejudice warranting reversal ... is to be determined on the circumstances of each case.' " *Id.* at 17, 580 A.2d 1044 (quoting *Beahm v. Shortall,* 279 Md. 321, 332, 368 A.2d 1005 (1977)). It noted:

> In determining whether ... extraneous matter considered by a jury, prejudicially affected the outcome of a civil case, the appellate court balances " 'the probability of prejudice from the face of the extraneous matter in relation to the circumstances of the particular case....' " It is not the possibility, but the probability, of prejudice which is the object of the appellate inquiry.

*Id.* at 17, 580 A.2d 1044 (citations omitted).

In *Allen v. State,* 89 Md.App. 25, 597 A.2d 489 (1991), *cert. denied,* 325 Md. 396, 601 A.2d 129 (1992), there were improper communications with jurors during a multiday deliberation period. The foreman notified the trial judge who then *voir dired* the jurors who had received the communication. During the *voir dire,* the trial judge established that the respective jurors were not influenced by the communication. The defendant moved for a mistrial, and the trial court denied the motion. One of the grounds of error asserted on appeal was the trial court's denial of the motion for mistrial. Judge Motz, for this Court, opined:

> The potency of the Sixth Amendment right to a fair trial relies on the promise that a defendant's fate will be determined by an impartial fact finder who depends solely on the evidence and argument introduced in open court.... That two jurors here were privy to extrinsic information which referred directly to the ultimate question of the appellants' innocence, therefore, is an extremely serious matter.

*Id.* at 42, 597 A.2d 489 (citations omitted). After discussing the concept of "invited error," Judge Motz wrote:

It is well established in Maryland that in determining whether jury contact is prejudicial, a trial court must balance the "probability of prejudice from the face of the extraneous matter in relation to the circumstances of the particular case." *Harford Sands, Inc. v. Groft,* 320 Md. 136, 138–39, 577 A.2d 7 (1990) (quoting *Wernsing v. General Motors Corp.,* 298 Md. 406, 411, 470 A.2d 802 (1984)). Where the record affirmatively shows prejudice by improper communications, the error requires reversal; but where the record affirmatively shows no prejudice, reversal is not required.

*Allen,* 89 Md.App. at 46, 597 A.2d 489. We then commented that

if the record does not show whether the error prejudiced the defendant, prejudice is presumed [in a criminal case], and the burden falls on the state to rebut the presumption of harm. *Id.; see Remmer v. United States,* 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954). The decision as to whether the State has met this burden is committed to the trial court's discretion and, like other motions for mistrial or new trial, will be reversed only upon a finding of abuse of that discretion. *Harford Sands,* 320 Md. at 146, 577 A.2d 7.

*Allen,* 89 Md.App. at 47, 597 A.2d 489.

We readily acknowledge that *Allen* was a criminal case and it can be argued that in such cases a "heightened" concept of prejudice exists, given the distinct nature of the constitutional aura that surrounds a criminal defendant. Moreover, in *Allen,* the jury was deliberating towards a verdict when the alleged improper receipt of communication came to the attention of the trial court and, therefore, was addressed by the trial judge prior to verdict. In contrast, in the case *sub judice,* the improper matter taken into the jury room apparently did not come to the attention of the trial court until after

the verdict, and it clearly was not addressed by the trial court until the post-verdict stage. Judge Motz noted in *Allen:*

Maryland follows Lord Mansfield's rule and thus "it is well settled that a juror [in Maryland] cannot be heard to impeach his own verdict." *Harford Sands,* 320 Md. at 145, 577 A.2d 7 (*quoting Wernsing,* 298 Md. at 411, 470 A.2d 802). Here, the problem of post-verdict impeachment is not at issue because the *voir dire* of the affected jurors occurred *prior* to the delivery of a verdict. In other words, the trial court's examination of the jurors and conclusion that they would not be prejudiced by the extrinsic information will not be disregarded on the grounds that the *voir dire* violated Maryland's strict verdict impeachment prohibition. Moreover, notwithstanding Maryland's very strict prohibition against juror impeachment, courts which have looser guidelines regarding post-verdict impeachment yield helpful guidance regarding when extrinsic evidence will be found sufficiently prejudicial to warrant a new trial.

*Allen,* 89 Md.App. at 47 n. 9, 597 A.2d 489.

The parties in the case *sub judice* refer us to two foreign cases. A factual situation similar to that in the present case occurred in *State v. Kehn,* 50 Ohio St.2d 11, 361 N.E.2d 1330 (1977). In that case, ten days after the jury verdict, the trial judge received from the jury foreman a notebook containing a digest of testimony, his personal reactions to the testimony, legal concepts, and "philosophical statements by St. Thomas Aquinas." *Id.* 361 N.E.2d at 1332. The notes had been taken into the jury room and circulated amongst the jurors. Unlike the present case, there was a *voir dire* of each juror that established that they had not been influenced by the notes. The trial court denied a motion for new trial and was affirmed on appeal. The Ohio Supreme Court opined:

Appellants assert . . . that the trial judge's possession of the notes . . . constituted evidence *aliunde,* thus permitting the inquiry into possible misconduct by the jury. . . .

The verdict of a jury may not be impeached by the testimony or affidavits of a member of that jury unless

there is evidence *aliunde* impeaching the verdict. Thus, before a juror may testify as to his own verdict, a foundation for that testimony must be acquired by the court, other than by testimony volunteered by the jurors themselves.

The Court of Appeals concluded that the trial judge's possession of the notebook did not constitute evidence *aliunde*. We disagree.... Such a detailed set of notes in the judge's possession constitutes more than a juror's admission or testimony as to possible misconduct. Rather, it is outside evidence which suggests the possibility[9] of prejudice.

*English v. American & Foreign Ins. Co.*, 529 S.W.2d 810 (Tex.Civ.App.1975), also involved the taking and using of notes, but not the "at home" summary and preparation of a compilation, as in the case *sub judice*. That court apparently disapproved of the taking and use of notes even if they were taken during trial and never left the courtroom. The court equated the use of such notes with the use of pretrial depositions during jury deliberations that was apparently also prohibited in Texas. Speaking of depositions, it stated:

> [T]he purpose of the prohibitions ... is to avoid undue emphasis of isolated portions of the testimony. If that be the purpose, the reasons underlying it would apply with even greater force to the jury's use of a memorandum made by one of its members....

*Id.* at 813. The court, nonetheless, affirmed because, upon its review of the notes, it held that "the record fails to show ... probable injury.... [T]he notes were ... referred to only to determine the exact date.... Those dates were undisputed.... [T]he use of the notes ... could not have harmed the plaintiff." *Id.* The court earlier had acknowledged:

> Whether the acts alleged to be misconduct actually occurred is a question of fact, and if the evidence is conflicting, the express or implied finding of the trial court on that question is ordinarily taken as final. But when the occurrence of the

---

**9.** The Maryland standard is probability of prejudice. Whether probability of prejudice exists by reason of the contents of the notebook, we have no way of knowing at the present time.

conduct is undisputed, the questions of whether it constituted misconduct and if so, whether such misconduct was material and probably resulted in injury ... are questions of law to be determined from the record as a whole. *Id.* at 812–13 (citations omitted).

In the case *sub judice*, the trial court refused to permit the parties to examine the juror's notebook. Thus, the parties could not then, and cannot now argue as to any specific extraneous matter contained in it. Nor could they then, nor can they now, address whether that extraneous material, if it exists, was, under the circumstances of this case, probably prejudicial.

We are acutely aware that appellant attempted to gain access to the notebook in order to verify what, if any, extraneous matter was contained therein and how and if that matter was impermissibly prejudicial, but was denied that right by the trial court. We note that there was no dispute below as to the existence of the notebook, that it had been prepared at home by the juror, that it contained that juror's thought processes, and that it was carried into jury deliberations where it was available for use. At this point in time, the only entities that knew of the contents of the notebook are the jurors and the trial judge. Had the notebook not been lost and were we able to determine, upon our review of the notebook or a recreation of its contents, that the trial court had not abused its discretion, we might have been able to affirm. In that situation, the trial court's denial as to the examination of the notebook, even if an abuse of discretion, may have been (though we do not so hold) nonprejudicial.

Although the affidavits of other jurors and the affidavits of investigators as to post-verdict comments by jurors are all clearly inadmissible attempts to cause jurors to impeach their own verdicts, *see Shapiro v. Chapman,* 70 Md.App. 307, 319, 520 A.2d 1330 (1987), evidence of the existence of the notebook and the taking of it into the jury room (as opposed to the manner of its use during those deliberations) was independently before the court and war-

ranted the right of examination by the parties. That type of an examination would not constitute the process of having jurors impeach their verdicts by investigating possible juror misconduct in deliberations, but would have been the investigation of the taking into the jury room extrinsic matter that may have created a "probability of prejudice."

> [W]here the focus of a motion for new trial is the infusion of extraneous matter in the jury's deliberations, and the prejudice to the moving party is great, it is an abuse of discretion to deny a motion for new trial. Thus, it may be concluded that a new trial may be granted whenever there is a fair probability that to fail to do so would deny a party a right to a fair trial.

*Thodos v. Bland,* 75 Md.App. 700, 708, 542 A.2d 1307, *cert. denied,* 313 Md. 689, 548 A.2d 128 (1988) (citation omitted).

In discussing the Maryland Rules Commentary, relied on, in part, by appellant, appellee points out in his brief:

> [E]ven the language cited is not applicable to this situation—other than the fact that the notes were not kept within the jury room—since there was no extraneous influence or "homework," which is the suggested danger of which the commentary warns.
>
> The "evidence" presented by Aron is Aron's counsel's representation of statements supposedly related to him by two *jurors* allegedly as to a difference of recollection.... The only other "evidence" was the investigator's affidavit ... gleaned from a *juror.* That was the totality of what was presented to the trial court, which then was asked to rule that there was a "probability of prejudice."

If that is *all* there was, appellee might be correct. But that is not all. First, it was not disputed below nor on appeal that the juror took his courtroom notes home with him in the evening and there, apparently using a computer, organized and compiled them for future use during jury deliberations. Moreover, according to appellee's counsel, as stated by him during the hearing on the motion, the respective juror had represented to appellee's counsel, in counsel's words: "He had

no extraneous matter in them. He added nothing to them *except his own thought processes* which is exactly what is protected by Rule." (Emphasis added.)

While, as we perceive the Maryland law, appellee's counsel's representations of what he was told is probably inadmissible, appellee would be hard put to argue now that that juror's "own thought processes" were not added outside the court and jury room. More important to our review of the limited issue of whether counsel should have been permitted to examine the notebook is the admissible, uncontradicted evidence presented with the pleadings.

Appellant's emergency motion for confiscation of the notebook contained the following averment:

2. Based upon interviews with several of the jurors and the alternate juror, *and based on undersigned counsel's own observation* and conversation with Mr. Bullard, plaintiff has learned the following.... This book was represented to have been prepared by Mr. Bullard outside of the courtroom. It appeared to contain Mr. Bullard's summary and commentary on the evidence and exhibits presented.

Appellant, in her motion, alleged further: "As this notebook was not part of the evidentiary record and was prepared outside the courtroom it constitutes extraneous material that was relied on by the jury.... Mr. Bullard engaged in 'homework.' "

While the affidavit of appellant's counsel contained representations of jurors' statements that would have been inadmissible, it also contained counsel's personal observations. Mr. Gittner, in his affidavit, stated, "[A]fter the jury rendered its verdict I had occasion to speak with some of the jurors." We note that it is not always inappropriate for counsel to speak to jurors after a verdict is rendered. Nor is it uncommon for counsel to speak to jurors as they leave the courtroom. Appellant's trial counsel continued in his affidavit:

At that time Mr. Hermon Bullard showed me a notebook that contained from 70–100 pages of type written notes. He only showed me the first page which appeared to summarize

the testimony of Chris Deri. The notebook appeared tabbed, highlighted and may have had dividers.

3. It did not dawn on me until the next day that Mr. Bullard obviously had to prepare a typewritten digest outside the courtroom and must therefore have taken his notes out of the court and jury room.

This affidavit, if truthful, and there is no evidence that it is not, is evidence that the notebook was prepared outside the courtroom and that it contained, at the least, Mr. Bullard's summarizations. What else, if anything, it may have contained, we shall never know unless the notebook is found.

██ As we have indicated, while we are unable to review whether the trial court's findings upon its review of the notebook constituted an abuse of discretion, its denial to appellant of the right to examine a document prepared outside of the courtroom and then taken into jury deliberations, was an abuse of discretion. Without that examination, appellant could not, as is apparent from counsel's argument to the trial court, properly present her position on this issue in order to support her motion for new trial. We hold that it was an abuse of discretion to deny to a party the right to examine matter compiled outside of a courtroom and then taken into a jury room. We hasten to add that we limit our holding to the express matter above. Had we, and the parties, had access to the notebook, we may well have concurred in the present appeal with the trial court's findings. Neither does our holding require a trial court to admit or consider juror's post verdict comments or affidavits in respect to what occurred during deliberations. It is only when there is independent evidence that inappropriate matter may have been taken into a jury room and been there available, is it an abuse of discretion to deny to a litigant the right to examine the matter so identified for extraneous and "probably prejudicial" content. As we have indicated previously, however, rather than reverse and ourselves order a new trial, we shall remand this matter to the trial court in an attempt to discern whether the record can there be corrected. See Md. Rules 8–414, 8–501(j),

8–604(a)(6), and 8–604(d) "Remand." We shall hereafter suggest the method to be used. First, however, we shall dispose of a final issue that is now susceptible of present resolution.

## III.

### Did the circuit court err in sanctioning Aron as a result of Aron's post[-]trial motion?

The trial court imposed sanctions under Maryland Rule 1–341 upon appellee's assertions that appellant had filed its Motion for New Trial in bad faith. Upon the state of the record we have examined, we disagree. We have not found any Maryland case on point. We know of no instance in our Courts' reported opinions, and the parties have not referred to any, when a juror worked at home with a computer to compile his notes, infused them with his thought processes, and then took them into the jury room to use during deliberations. Because of the loss of the notebook, we cannot decide the ultimate issue. Nevertheless, it is an issue that needs to be addressed. Moreover, had we been able to review the notebook and had we then determined that extrinsic matter was contained therein that was "probably prejudicial," we would have reversed the imposition of sanctions on that ground as well. Under these circumstances, there was no bad faith, and the inquiry made through the motion for new trial was justified. Maryland Rule 1–341 simply was not meant to be used under these circumstances. Additionally, appellee, through this device, may have "back doored" into the sanction proceedings part of his costs of litigation (not court costs) in the underlying trial on the merits by apparently including in his bills the cost of depositions and other expenses. If so, this would have been a violation of the "American Rule." Even if we were affirming on all of the other issues, we would (and do) reverse the imposition of sanctions.

### Holding

For the reasons we have stated, we hold that the trial court did not err in permitting the testimony of attorneys Kahn and

Harrison. Accordingly, we answer appellant's first question in the negative. We answer appellant's third question affirmatively and hold that sanctions were improperly imposed and reverse on the merits the trial court's imposition of Rule 1–341 sanctions. Moreover, sanctions under Maryland Rule 1–341 are never mandatory, although in circumstances substantially dissimilar to those in the present case, it may be, on rare occasions, an abuse of discretion not to impose them.

We shall not fully answer appellant's second question. We do hold, however, that it was an abuse of discretion, under the circumstances here present, to deny to appellant the right to examine the notebook prepared at the subject juror's home. But, as we have said, if that notebook was available for our review, we would have been able to determine whether that denial had itself impermissibly prejudiced appellant, *i.e.*, whether the trial judge had additionally abused his discretion when, upon his review of the notebook, he determined that it contained no extraneous matter that probably prejudiced appellant. With the loss of the notebook, we cannot perform our function. That fault is not appellant's. Accordingly, we shall attempt to remedy the matter of the lost notebook by directing a remand limited to specific trial court proceedings.

We were advised at oral argument that the notebook, which had been formulated on the juror's home computer, may be duplicated in its original form, because that juror still has it preserved either on the computer's hard drive or on a floppy disc.

We, therefore, remand this matter to the trial court to do the following:

1. Issue a subpoena duces tecum to the juror directing him to prepare a duplicate hard copy of that notebook and bring the hard copy and any relevant floppy disc to the court proceeding.

2. Place the juror under oath after which the trial court shall ask him questions directed only to whether the copy produced at that hearing is an exact duplicate copy of the notebook that has been lost. At its discretion, the trial

court may permit the parties to ask questions limited to the authenticity of the duplicate. Under no circumstances is the trial court or the parties to ask any questions relative to jury deliberations or to the actual use of the notebook's contents during deliberations.

3. If the juror is able to produce a hard copy that the juror testifies is an exact copy of the lost notebook, the trial judge is to then examine it. If the trial judge is convinced that that copy is an exact copy of that notebook—but only if he is so satisfied, he shall admit it and *file it with the record.*

4. The parties are then to be afforded a full opportunity to examine that notebook and appellant shall have the opportunity to renew her motion for new trial if she deems it appropriate. In the event such a renewal motion is made, both parties shall have a full opportunity to reargue based upon the matters developed from an examination of the notebook.

5. After arguments on renewed motions, the trial court shall reconsider its ruling on the new trial motions. During that reconsideration, it shall consider all matters developed during these new proceedings presented by both parties. It shall reconsider them in light of the law as stated in this opinion, and render its ruling.

6. Either party may appeal from that decision. As we herewith have resolved all other issues, such subsequent appeal, if any, shall be limited to the issues raised, and/or considered and resolved during the remand.

If the juror did not retain the capability to produce an exact duplicate hard copy, or the floppy disc that can produce one, the trial court is to order a new trial on all issues except as to sanctions. If after such a hard copy is produced and after the juror has testified as to its authenticity, the trial court remains unconvinced that that copy accurately reflects in all respects the original notebook or if the trial judge's recollection is insufficient to permit him to be satisfied that the copy is exact—in other words if he does not sufficiently remember the original to make an adequate comparison, he is to order a new

trial on all issues except as to the imposition of Rule 1–341 sanctions.

We shall apportion appellate costs between the parties, as neither caused the notebook to be made, took it into the jury room, denied access to it, kept it separate from the record, and subsequently lost it.

**JUDGMENT IMPOSING MARYLAND RULE 1–341 SANCTIONS REVERSED; CASE OTHERWISE REMANDED WITHOUT AFFIRMANCE OR REVERSAL FOR FURTHER PROCEEDINGS CONSISTENT WITH OUR HOLDING; COSTS TO BE PAID 50% BY APPELLANT AND 50% BY APPELLEE.**