REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 713

September Term, 2013

RUSSELL ANDERSON

v.

STATE OF MARYLAND

Eyler, Deborah S.,
Kehoe,
Rodowsky, Lawrence F.
(Retired, Specially Assigned),

JJ.

Opinion by Eyler, Deborah S., J.

Filed: December 17, 2014

In the Circuit Court for Montgomery County, Russell Anderson, the appellant, was tried by a jury on two counts of first-degree rape of Rosa Molina. According to Molina, a firearm was used in the rape, and a second man, co-defendant Timothy McLaughlin, also raped her. According to the appellant, who testified at trial, his sexual encounter with Molina was consensual. The jury convicted the appellant and McLaughlin and both were sentenced to two consecutive terms of life in prison.[1]

The appellant challenges two rulings by the trial court admitting extrinsic evidence that, two weeks after the day Molina maintains she was raped, the police searched his apartment and found a handgun. In fact, the search was in connection with an entirely different case, and the handgun found during the search could not be shown to be the weapon used against Molina. The court ruled, however, that the evidence was admissible to impeach by contradiction the appellant's testimony, on cross-examination, that he did not have a handgun in his apartment at the relevant time.

We conclude that the trial court's rulings were an abuse of discretion. The evidence in question was extrinsic evidence concerning a collateral matter. It had virtually no probative value. And the danger that its admission would unduly prejudice the appellant and would confuse and mislead the jurors greatly outweighed any probative value it might have had. We shall reverse the judgments of conviction and remand the case for further proceedings.

---

[1]McLaughlin noted a separate appeal. His convictions were affirmed in an unreported opinion of this Court filed on June 17, 2014.

## FACTS AND PROCEEDINGS

Based on DNA evidence, the appellant and McLaughlin were charged, in 2012 with raping Rosa Molina on December 22, 1989. The rapes were committed in the basement laundry room of the apartment building in which Molina was living with her husband, young daughter, brother-in-law, and sister-in-law. In late 1989/early 1990, the appellant and McLaughlin were co-workers and friends. McLaughlin's sister lived in the same apartment building as Molina. The appellant and his girlfriend were living in an apartment in Washington, D.C. Molina did not know the appellant, McLaughlin, or McLaughlin's sister.

The case went to trial in April of 2013. Molina was called by the State and testified that on the afternoon of December 22, 1989, she was doing laundry in the basement of her apartment building when a man entered, approached her, and held a long black gun against her head. A second man entered the laundry room, closed the door, and turned the lights off. Both men were wearing black masks. Molina only could see their eyes. Each man raped her as the other man held the gun to her head. When they were finished, they left the laundry room. Molina went to her apartment and told her husband what had happened. After wiping her vaginal area off with tissues, taking a bath, and changing her clothes, she called the police and reported the rape. The police took a statement from her and collected her clothes and the tissues. She was transported to a hospital, where she underwent a vaginal examination.

On cross-examination, the defense elicited several inconsistencies between the facts Molina reported to the police after the rape and the facts she testified to at trial. Of importance here, Molina acknowledged that when the police interviewed her she told them that the gun that was held to her head was blue with a wooden handle, not long and black.

The State also called the investigating police officers, including two who interviewed Molina. One officer questioned her in Spanish, as she did not speak English, and translated what she was saying into English. He testified that Molina told him that after both men left the laundry room one man returned, and then Molina's sister-in-law entered the laundry room; and that for some time, both women and one of the men were in the laundry room together.

In addition, the State called the emergency room doctor and a forensic biologist. Together their testimony established the chain of custody of the evidence from which DNA was obtained in 2012, and the process by which that DNA was determined to match DNA from the appellant and McLaughlin.

The appellant took the stand and testified as follows. On December 22, 1989, he got off work at 8:00 or 9:00 a.m., having worked an extended overtime night shift. He walked to McLaughlin's sister's apartment building to find McLaughlin, who had agreed to lend him money to pay his rent. He and McLaughlin's sister entered the apartment building at the same time. They took the elevator and got off at the sister's floor, where they encountered McLaughlin and Molina "touching each other" and "laughing and playing." The appellant

3

had never seen Molina before. McLaughlin's sister said she wanted to see her brother inside her apartment. McLaughlin whispered something in Molina's ear, took some money out of his pocket, put it in her "shirt-type area," "smacked her on the butt," and left with his sister.

Molina grabbed the appellant's hand and led him to the elevator and then to the basement laundry room. They "started making out." The appellant put his coat on the floor and they had sexual intercourse on top of it. He did not force himself on Molina and she did not push him away or tell him she did not want to have sex. He did not use a condom and ejaculated inside of Molina. Afterward, while they were getting dressed but were not yet fully clothed, a woman entered the laundry room and spoke to Molina in Spanish. The appellant could not understand what the woman was saying, but could tell she knew Molina and was "agitated or serious - angry." Molina answered the woman in Spanish and started to cry.

The appellant finished getting dressed, left the laundry room, and went to McLaughlin's sister's apartment to get the money. He then went home to the apartment in D.C. where he was living with his girlfriend.

We shall include additional facts in our discussion of the issues.

## DISCUSSION

### A.

On January 5, 1990, exactly two weeks after Molina reported that she had been raped, a woman from Washington, D.C., called the District of Columbia Metropolitan Police ("D.C.

4

Police") and reported that the appellant had raped her at gunpoint. The D.C. Police immediately obtained and executed a search warrant for the appellant's apartment. They seized several items, including a handgun they found in the living room closet. The police report of the search ("D.C. Police Report") describes the handgun as a "Revolver, 36 cal., Navy Model, from the Hawes Firearm Co., black with brown wood grips, black electrical tape wrapped around grip, cylinder and hammer, Serial # 7547."

On the third day of trial, the prosecutor informed defense counsel of the existence of the D.C. Police Report and furnished them copies. Before the appellant's counsel called the appellant to testify, he moved to preclude the prosecutor from using the D.C. Police Report on cross-examination and from introducing it into evidence. He argued that the report had not been timely disclosed and, in any event, whatever probative value it might have was substantially outweighed by the danger of unfair prejudice in admitting it. The latter argument was based largely on the fact that the State was *not* contending that the handgun found in the police search of the appellant's apartment on January 5, 1990, was the weapon that was used against Molina.

The trial court ruled that the State had not committed a discovery violation and that the prosecutor could use the report for impeachment. The judge observed that the report had not "been offered in any way, shape, or form, as substantive evidence in the [S]tate's case . . . that this is in fact the gun" and that it "is not coming in as evidence [and] does not go back to the jury." He stated that the report was "simply going to be used if the situation

5

presents itself for purposes of cross examination," and cautioned that the report's use would need to be "carefully limited."

On cross-examination of the appellant, the prosecutor established that in 1989 he and his girlfriend were living in a particular apartment in D.C., and were the only people living there.[2] When asked whether he had purchased a .36 caliber Navy Model handgun, black with a wood handle, the appellant answered, "No." He also denied ever owning a handgun or any gun. He acknowledged that there had been a closet in the living room of the apartment in which he and his girlfriend had been living, but said that other than coats and some boxes of mail he could not remember what was in it.

The prosecutor showed the appellant the D.C. Police Report, describing it only as "what's been marked for identification as State's 24." She gave the appellant an opportunity to read it, which he did. He was not asked to identify what he was looking at, and did not do so. The appellant then testified that he had shared the living room closet with his girlfriend. When asked whether it was true that in 1989, a .36 caliber Navy Model revolver was kept in that closet, he answered "No."[3]

---

[2]As noted, the search of that apartment was carried out on January 5, 1990, not in 1989. No one argues that it is of any significance that the prosecutor often focused on 1989 in questioning the appellant about where he lived. It was apparent that the D.C. apartment in which the appellant and his girlfriend were living on January 5, 1990, was the same apartment in which they were living in 1989.

[3]Again, there is no argument made that the prosecutor's reference to 1989, when the search was on January 5, 1990, is of any significance.

At that point, the prosecutor requested a bench conference and moved to admit the D.C. Police Report into evidence, under Rule 5-616(b)(2). Over a hearsay objection, the trial court ruled that the report would be admitted for the sole purpose of showing that on January 5, 1990, a handgun was found in the living room closet of the appellant's apartment. The court made clear that before the report would come into evidence the prosecutor would have to redact it to eliminate everything other than the address of the apartment, the date of the search, and the list of items recovered.

The appellant's testimony concluded, the defense rested, and court recessed for the day.

The next morning, before the jurors were brought into the courtroom, the prosecutor announced that she planned to call Detective Juanita Terrell as a rebuttal witness. She identified Detective Terrell as "the original investigator from the D.C. case" who "was in charge of a law enforcement search of [the appellant's apartment]" on January 5, 1990, in which the "weapon in question" was found. The prosecutor's stated purpose in calling Detective Terrell was to "remedy the issue of any hearsay with respect to" the D.C. Police Report.

In the ensuing conversation among counsel and the court, the prosecutor said, as she had said before, that the State was _not_ contending that the handgun seized from the appellant's apartment was the same weapon used against Molina. Defense counsel argued that whether a handgun that was _not_ the handgun used against Molina was or was not present

7

in the appellant's apartment two weeks after Molina's rape was a "collateral issue" that extrinsic evidence ordinarily could not be used to prove; and that in deciding whether such evidence was admissible the court needed to engage in a Rule 5-403 weighing process. On that point, defense counsel asserted that the impeachment value of Detective Terrell's testimony was slight but its potential for unfair prejudice was great, because the handgun seized from the appellant's apartment on January 5, 1990, "more or less match[ed]" the description of the weapon Molina had given the police on December 22, 1989.

The court found that the evidence that a handgun was recovered in the search of the appellant's apartment on January 5, 1990, was not being used substantively; it was being used solely to discredit his testimony that no such handgun was in his apartment on the date of the search. The court concluded that the probative value of the State's evidence "far outweighs any prejudice." The judge later supplemented his ruling to explain that it was based mainly on the close temporal relationship between the rape on December 22, 1989, and the police search of the appellant's apartment on January 5, 1990.

Detective Terrell took the stand and testified that on January 5, 1990, she was in charge of a "law enforcement related search" of the appellant's apartment in the District of Columbia. The prosecutor showed the detective a document, which the prosecutor described as "what's been marked as State's Exhibit 25." It was another copy of the D.C. Police Report. The prosecutor asked Detective Terrell whether the document refreshed her recollection about the search, and she replied that it did. The prosecutor then asked, "[W]hat,

8

if anything, did that search yield related to a weapon?" Detective Terrell answered that the search yielded a handgun, which she described using the terminology in the report.

On cross-examination, Detective Terrell testified that she was not present during the search of the appellant's apartment and that the words "Navy Model" in the description of the handgun that was seized did not refer to the color of the handgun. On redirect examination, the detective explained that, even though she was not present when the search was carried out, she was the lead detective in the case in which the search was being conducted and was in charge of maintaining the evidence seized in the search, including the handgun.

Upon the conclusion of Detective Terrell's testimony, defense counsel again objected to her being allowed to testify and moved for a mistrial or to have her testimony stricken on the ground that it was not based on personal knowledge. The court overruled the objection, denied the motion for mistrial, and denied the motion to strike.

In her "opening" closing argument, the prosecutor said nothing about the handgun seized from the appellant's apartment. McLaughlin's lawyer did not comment about it either. Counsel for the appellant mentioned the handgun briefly, observing that it was a "red herring" because it had no connection to this case and pointing out that the appellant's girlfriend also was living in the apartment and there was no forensic evidence, such as DNA or fingerprints, linking the handgun to the appellant.

9

In her rebuttal closing, the prosecutor argued as follows about the appellant's testimony and Detective Terrell's testimony:

> Evidence doesn't lie. People lie. And the fact of the matter is [the appellant] got up on that stand, and he took that oath, and he lied. And how do we know that he lied? . . . That witness [referring to Detective Terrell] wasn't put on in the [S]tate's case in chief. That witness came on after [the appellant] took the stand. After [the appellant] got up there and despite questioning otherwise, said nope, not my apartment, not 37 Seton Place, 2nd floor is there a gun. That's a lie. [The appellant] is a liar.
>
> **That witness [again referring to Detective Terrell] came up to show that, yes, January 5th, a mere two weeks afterwards, and what kind of gun was it? The blue one**.

(Emphasis added.) Counsel for McLaughlin lodged an objection, which was overruled.

After closing arguments, the prosecutor approached the court and asked permission to withdraw Exhibit 24 -- the D.C. Police Report she had used in cross-examining the appellant, and that the court had ruled would be admitted into evidence subject to redaction. (It never was redacted.) The prosecutor explained that she wanted to withdraw the exhibit "just because we had a live testimony just to preserve the record." The court granted the request and the D.C. Police Report was not made part of the evidence and was not submitted to the jury.[4]

---

[4]The record includes three marked exhibits that contain all or a portion of the D.C. Police Report. None of them were in evidence when the case was submitted to the jury for deliberation. Defendant's Exhibit 2 is the exact same document as State's Exhibit 24. It is a police report for Metropolitan Police Department case number 90-00124 and a complaint of "rape while armed" made by a named victim on January 5, 1990. Defendant's Exhibit 2 was admitted into evidence at a pretrial motions hearing, but not at trial. The report includes

(continued...)

During deliberations, the jurors asked for Exhibit 24.  Their request was denied.

**B.**

Rule 5-616(b) governs the admissibility of extrinsic evidence to impeach a witness by contradiction, *i.e.*, to contradict a fact or matter testified to by the witness.  Evidence is "extrinsic" when it is "proved through another witness, or by an exhibit not acknowledged or authenticated by the witness sought to be contradicted . . . ."  Lynn McLain, 6 MARYLAND EVIDENCE STATE AND FEDERAL §607:3, at 553 (3d ed. 2013) (hereinafter "McLain") (footnote omitted) (citing 3A Wigmore § 878 (rev. 1970)). The rule states:

> (b) **Extrinsic impeaching evidence**. (1) Extrinsic evidence of prior inconsistent statements may be admitted as provided in Rule 5-613(b).
> (2) *Other extrinsic evidence contradicting a witness's testimony ordinarily may be admitted only on non-collateral matters.  In the court's discretion, however, extrinsic evidence may be admitted on collateral matters.*
> . . .

---

[4](...continued)
a partial list of items seized from the living room closet of the appellant's D.C. apartment, including "One Revolver, 36 cal., Navy Model, from the Hawes Firearms Co., black . . . ." The second line of text describing the handgun is partially cut off. The top and bottom of the report set forth "metadata," including a reference to a portable document format (pdf) and a Google document.

State's Exhibit 25 is page 1 of the two-page D.C. Police Report.  It does not show metadata at the top or bottom of the document, but contains the same information as Defendant's Exhibit 2 and State's Exhibit 24, as well as additional information about the items seized from the living room closet of the appellant's D.C. apartment, and about additional items seized from the bedroom floor of that apartment.  Two signatures appear under the list of items that were seized.  Exhibit 25 is the document that was shown to Detective Terrell for the sole purpose of refreshing her recollection. Again, none of these documents was received into evidence.

11

(Emphasis added.)

The D.C. Police Report and Detective Terrell's testimony were "extrinsic evidence" that the State was using to impeach the appellant's testimony by contradiction. As discussed, the appellant testified, on cross-examination, that there was no handgun in his apartment when he lived there in late 1989/early 1990. The D.C. Police Report showed that a handgun *was* present in the appellant's apartment, as one was recovered by the police in a search of the apartment on January 5, 1990. Detective Terrell's testimony established the same thing. Thus, the D.C. Police Report and Detective Terrell's testimony each contradicted the appellant's testimony.

Rule 5-616(b)(2) is derived largely from the holding in *Smith v. State*, 273 Md. 152 (1974), which preceded the 1994 adoption of the Maryland Rules of Evidence. In *Smith*, a husband was shot by his wife and was taken to a hospital, where he later died. Before the husband's death, a police officer questioned him about the incident. The husband identified his wife as the shooter and said he "would get her." *Id*. at 155. After the husband died, the wife was charged with second-degree murder. At trial, her defense was that the shooting was accidental.

The officer testified about what the husband had told him. On cross-examination, he said he remembered getting a telephone call from an investigator from the Office of the Public Defender. When asked "isn't it true" that he told the investigator that the husband had told him the shooting was accidental, the officer denied that.

In the defense case, the wife sought to call the investigator, proffering that he would testify that, in his telephone call with the officer, the officer said the husband had told him the shooting was accidental. The court ruled the testimony inadmissible hearsay. The wife was convicted and the case ultimately was heard by the Court of Appeals, which reversed, holding that the trial court had abused its discretion by precluding the investigator from testifying.

The Court noted that a witness, including a party, "may be cross-examined on any matter relevant to the issues, and the witness's credibility is always relevant." *Smith*, 273 Md. at 157. It recognized, however, that there are "restrictions upon the extent to which extrinsic evidence may be used to impeach a witness, such evidence generally not being allowed on a collateral or irrelevant matter." *Id.* "In such cases, the cross-examiner is bound by the answer of the witness . . . ." *Id.* The Court also observed that some evidence is irrelevant, even to credibility, and that "evidence which is otherwise irrelevant cannot become relevant simply because it is capable of being contradicted, and will thereby impeach the witness . . . ." *Id.* at 158. If such "irrelevant evidence is admitted, it cannot be contradicted by extrinsic evidence." *Id.*

The Court explained that, "[e]ven in the case of subject matter which may be validly pursued on cross-examination, the witness can be impeached by extrinsic evidence only with regard to material facts and not with respect to facts that are *collateral*, *irrelevant*, or *immaterial* to the issues of the case . . . ." *Id.* Because "the rule preventing impeachment of

13

a witness by extrinsic evidence on a collateral matter is aimed at preventing inconvenience, loss of time, unfair surprise to the witness and confusion of the issues . . . [a] weighing of various considerations is involved." *Id*. at 159. Emphasizing relevancy over admissibility, the Court articulated a "test of collateralness": "whether the fact as to which the error is predicated is relevant independently of the contradiction; and not whether the evidence would be admissible in terms of satisfying the rules of evidence." *Id*. at 162.

The Court concluded that the investigator's proffered testimony was relevant because it could shed light on whether the shooting was accidental; and it only was ruled inadmissible on hearsay grounds. The Court held that the investigator's testimony should have been admitted for the sole purpose of impeaching the testimony of the officer. "For this purpose, it [is] not hearsay, and, as we have observed, it is relevant . . . . [T]he matters here are relevant independently of the self-contradiction." *Id*. at 163. *See also Aron v. Brock*, 118 Md. App. 475 (1997) (in a defamation action by plaintiff political candidate against defendant opponent for publishing that she had been held liable for fraud in two civil actions, testimony of lawyers who filed those actions was relevant to show the outcomes in those cases and therefore the truth or falsity of the defendant opponent's statements; the lawyers' testimony was extrinsic evidence used to impeach by contradiction, but was not collateral).

In the case at bar, the parties disagree about the issue of collateralness. The State maintains that the fact it sought to prove through the D.C. Police Report and Detective Terrell's testimony -- that a handgun was present in the appellant's apartment on January 5,

14

1990 -- was not collateral. Therefore, it was entitled to have the jury consider the D.C. Police Report and Detective Terrell's testimony contradicting the appellant's testimony that there was no handgun in his apartment at that time.

The appellant counters that whether he did or did not have a handgun in his apartment on January 5, 1990, was at most a collateral matter. Therefore (as the trial court found), the State was not entitled to introduce the D.C. Police Report into evidence and to call Detective Terrell to testify that a handgun in fact was in his apartment on January 5, 1990. Rather, that evidence could be admitted in the discretion of the trial court, after a Rule 5-403 weighing analysis.

In her treatise on evidence, Professor McLain describes a process for determining collateralness that is consistent with the "test for collateralness" of the Court of Appeals as stated in *Smith* and with its emphasis on relevancy:

> Determining what is collateral requires a mental sleight-of-hand. The analysis is made by looking at the subject matter of the evidence as if it were being offered for substantive purposes, even though it is being offered only to impeach. One must look at the subject matter of the evidence offered and determine whether the subject matter is relevant and material to the substantive issues in the case (issues that would have been a proper subject of proof, even if the particular witness sought to be impeached had not testified); if so, the contradictory extrinsic evidence is admissible, because it does not pertain to a collateral matter.

McLain, § 607:4, at 555 (footnote omitted).

The subject matter of the D.C. Police Report and Detective Terrell's testimony was the presence of a handgun in the appellant's apartment on January 5, 1990. The State had

15

no proof that that handgun was the weapon used against Molina on December 22, 1989, and the prosecutor made clear to the court that the State was not pursuing that theory. In its brief, the State acknowledges that it "did not and could not prove that the gun seized from [the appellant's] closet was the gun used in the rape" of Molina.

Absent any evidence connecting the handgun found in the appellant's apartment to the handgun used against Molina, the fact that there was a handgun in the appellant's apartment two weeks after Molina was raped, as the D.C. Police Report and Detective Terrell's testimony showed, did not have "any tendency to make the existence of any fact that [was] of consequence to the determination of the [rape charges] more probable or less probable than it would be without the evidence" of that fact. Md. Rule 5-401. Without being relevant to any fact or issue in the case, the evidence had no substantive value and would not have been admissible independently, that is, if the appellant had not testified.

The State insists that because it was undisputed (given the DNA evidence) that Molina and the appellant had had sex, guilt or innocence depended entirely upon whether the jurors believed Molina, that she was raped, or the appellant, that he and Molina had consensual sex. Therefore, the appellant's credibility was a material, not a collateral, issue.[5] It argues that because "credibility was critical to the resolution of the ultimate question presented to the

---

[5]The State also asserts, several times, that because the appellant elected to testify he "put his credibility directly at issue" and the State was "entitled to vigorously cross-examine him." The issue on appeal does not concern cross-examination of the appellant. It concerns the admission of extrinsic evidence to impeach by contradiction.

jury," evidence undermining the truth of the appellant's testimony was central, not collateral.

As the appellant points out, the question is not whether the appellant's _credibility_ was a collateral issue; it is whether _the fact or matter that was being used to impeach his credibility_ was a collateral issue. The presence or absence of a handgun in the appellant's apartment on January 5, 1990, as a fact, was not relevant to any substantive issue in the case. The _Smith_ Court made clear that an irrelevant fact that comes into evidence does not become relevant merely because there is extrinsic evidence to contradict it. Indeed, if that were so, the distinction in Rule 5-616(b)(2) between the admissibility of evidence on a collateral matter that impeaches by contradiction and the admissibility of evidence on a non-collateral matter that impeaches by contradiction would be meaningless. All such contradictory impeachment evidence would be on a non-collateral matter and therefore would be admissible.

Having established that the D.C. Police Report and Detective Terrell's testimony concerned a collateral matter, we turn to whether the trial court abused its discretion when it decided, upon a weighing of the Rule 5-403 factors, to admit this evidence. Under Rule 5-403, "relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." As we have discussed, the trial court concluded that the probative value of the evidence that a handgun was present in the appellant's apartment two weeks after Molina's rape "far outweighs any prejudice" that would result from its admission.

17

The appellant contends this ruling was an abuse of discretion because the evidence in question had virtually no probative value and was highly likely to unfairly prejudice him. In particular, he asserts that the jurors probably would infer, incorrectly, that the handgun found in the appellant's apartment was the handgun used against Molina, in part because Molina had told the police that the gun that was held to her head was blue with a wooden handle, and the handgun found in the appellant's apartment was a "Navy Model" handgun. Indeed, in her rebuttal closing argument, the prosecutor described the handgun seized from the appellant's apartment as "[t]he blue one."

The State's argument in support of the trial court's ruling on the Rule 5-403 factors is almost identical to its argument on collateralness. It maintains that, because the primary issue for the jury to decide was whether the sexual encounter between Molina and the appellant was consensual,

> the use of the handgun to commit the rapes was a relevant and central issue in the trial. And Ms. Molina's description of the gun was similar to the description [of] the gun found in [the appellant's] closet only two weeks after Ms. Molina was raped. The cross-examination of [the appellant], even though it did not prove that the gun found in [his] apartment was the gun used during Ms. Molina's rape, struck at the core of [his] credibility, strongly suggesting that [he] was lying about his knowledge of the gun in his apartment and thus lying to the jury about the sexual encounter with Ms. Molina. The jury was permitted to draw reasonable inferences from the evidence and to believe or disbelieve, all, parts, or none of [the appellant's] testimony.

For the following reasons, we conclude that the probative value of the D.C. Police Report and Detective Terrell's testimony establishing that a handgun was found in the appellant's apartment two weeks after Molina was raped was non-existent, and, even if there

18

was some negligible probative value to the evidence, it was substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury. To be sure, the abuse of discretion standard is highly deferential. However, the circumstances here compelled a finding contrary to the one made by the trial court.

On the probative value side of the equation, as already discussed, the fact the extrinsic evidence was admitted to prove -- that a handgun was found in the appellant's apartment two weeks after the rape -- was irrelevant. The State conceded that it did not have evidence connecting the handgun found in the appellant's apartment on January 5, 1990, to the weapon Molina claimed was used against her. The presence of the unconnected handgun in the appellant's apartment two weeks after the sexual encounter between him and Molina did not tend to show that he held a gun to Molina's head during that encounter; nor did it tend to show anything else pertinent to whether he had raped Molina. The appellant's testimony that a handgun was not present in his apartment, true or not, did not relate to any important issue in the case.

On this last point, Professor Alan D. Hornstein provides a helpful contrasting illustration of when a trial court reasonably would exercise discretion to admit extrinsic evidence to contradict a collateral matter:

> One might expect the exercise of . . . discretion [to admit such extrinsic evidence] where the matter is collateral in a strict sense but forms the linchpin of the witness's testimony. A witness might testify, for example, that she remembers a particular event because it was coincident with some other event. Though technically collateral, extrinsic evidence of the non-existence of this

19

other event would tend to call into question the witness's testimony on the principal matters.

Alan D. Hornstein, *The New Maryland Rules of Evidence: Survey, Analysis and Critique*, 54 Md. L. Rev. 1032, 1056 (1995). In the case at bar, the appellant did not testify on direct examination that he could not have held a gun to Molina's head during their sexual encounter because he did not have access to a handgun. The topic of the appellant's access *vel non* to a handgun was not even mentioned in his testimony, and certainly was not its linchpin. Indeed, the topic only was raised by the prosecutor, on cross examination.

On the other side of the Rule 5-403 equation, the danger of unfair prejudice, confusion of the issues, and misleading the jury from admitting the D.C. Police Report and Detective Terrell's testimony was overwhelming and significant. This extrinsic evidence showed that two weeks after the day Molina was claiming she was raped the appellant's apartment was searched by "law enforcement" in a case for which Detective Terrell was the lead investigator. Although it was made clear during the colloquies between the court and counsel at the bench that the appellant's apartment was searched as part of the investigation of an entirely separate case against him, that was not communicated to the jurors. The jurors reasonably but incorrectly could have inferred that the search was conducted in connection with this case, and that the handgun that was recovered was the weapon that was used against Molina. Obviously, such an inference would seriously prejudice the appellant.

Moreover, given that Detective Terrell was identified as a member of the D.C. Police and the chief detective in charge of the "law enforcement related search" of the appellant's

20

apartment, the jurors also reasonably could have inferred that the search was carried out in another case against the appellant, in the District. This inference would have been correct, but also highly prejudicial, in much the same way that propensity evidence is prejudicial; the jurors would think that the appellant was a member of the criminal element with easy access to handguns. For this same reason, there was no clarification that could have been given to the jurors about the search that would not have been prejudicial itself.

As noted, the trial judge supplemented his ruling to explain that the primary basis for his decision to admit the extrinsic evidence was the closeness of time (two weeks) between the alleged rape of Molina and the search of the appellant's apartment that revealed the handgun. If anything, the close temporal relationship between the alleged rape and the search increased the prejudicial effect of the irrelevant evidence. Although the State was not contending that the handgun found in the appellant's apartment was the weapon used against Molina, the jurors were not given that information. They were left to speculate. The closer the time between the alleged rape and the search that revealed the handgun, the more likely it would be that the jurors would draw an inference that the handgun was the weapon used against Molina. (And, as with the search itself, there was no clarifying instruction that could have been given that would not have prejudiced the appellant.)

The extrinsic evidence not only was highly prejudicial, it was bound to confuse the jurors. The jury heard Molina testify on cross-examination that she told the police who interviewed her that the men who raped her used a gun with a blue handle. (This was after

she testified on direct examination that the gun was black.) The handgun found in the search of the appellant's apartment was described in the D.C. Police Report and by Detective Terrell as a .36 caliber "Navy Model" revolver. Even though Detective Terrell testified that "Navy" referred to the model of the weapon, not its color, in rebuttal closing the prosecutor described the handgun found in the appellant's apartment as "blue."

For all these reasons, the trial court erred and abused its discretion in admitting the extrinsic evidence in this case. The court's ruling with respect to the D.C. Police Report was harmless error. The report was not received in evidence at trial, as the prosecutor withdrew it. The court's ruling admitting Detective Terrell's testimony was not harmless beyond a reasonable doubt, however. Accordingly, the convictions must be reversed. Because there was legally sufficient evidence to support them, we shall remand the case to the circuit court for further proceedings.[6]

> **JUDGMENTS REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS. COSTS TO BE PAID BY MONTGOMERY COUNTY.**

---

[6]The appellant raises several other issues. He contends the trial court abused its discretion by not finding that the State had constructive notice of the existence of the D.C. Police Report prior to trial, and therefore committed a discovery violation by waiting to turn it over until it did. He also contends the trial court abused its discretion in permitting the State to call Detective Terrell on rebuttal because her testimony merely bolstered the State's impeachment evidence; was on an issue injected into the trial by the State; and was not based on personal knowledge. Finally, he contends the court erred by denying his mistrial motion. Our disposition obviates the need to address any of these issues.